**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EXOTIC LEASING, LLC**<br>100 East Broad Street, Suite 230<br>Columbus, Ohio 43215, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. |
| *v.* | ) ) | Judge |
| **7TH GEAR EXOTICS LLC**<br>5650 Groveport Road<br>Groveport, Ohio 43125, | ) ) ) ) | |
| *and* | ) ) | **JURY DEMAND**<br>**ENDORSED HEREON** |
| Tiff A. **COOK**<br>5650 Groveport Road<br>Groveport, Ohio 43125, | ) ) ) ) | |
| *and* | ) ) | |
| Saththia **LINGAN**<br>2424 Shroton Court<br>Powell, Ohio 43065, | ) ) ) ) | |
| *and* | ) ) | |
| **ES EXOTICS LLC**<br>6608 Bluebird Lane<br>Canal Winchester, Ohio 43110, | ) ) ) ) | |
| *and* | ) ) | |
| Ergi **SULEJMANI**<br>6608 Bluebird Lane<br>Canal Winchester, Ohio 43110,<br>*Defendants*. | ) ) ) ) | |

## VERIFIED COMPLAINT

This Verified Complaint details a massive and brazen title fraud operation spanning two

states and over 48 exotic supercars worth over $10 million dollars, including numerous

Lamborghinis, Rolls Royces, McLarens, Ferraris, Porsches, and others.  The multiple Defendants

conspired together to defraud Plaintiff out his multimillion-dollar investment through a coordinated effort of fabricated documents, false promises, and fraudulent titles. Unbeknownst to Plaintiff, one of the Defendants has a long running and well-established history of title fraud in Ohio, selling or brokering vehicles that he knew he did not have valid title to—accepting the full purchase price and yet failing to deliver titles. Instead of purchasing vehicles with over $10 million invested by Plaintiff, granting the titles and liens, and paying the revenue share as expressly agreed, Defendants simply financed or otherwise secured cars, without titles, represented them as being purchased, and then disposed of them without even notifying Plaintiff.

Plaintiff, Exotic Leasing, LLC ("ELL"), by and through its undersigned counsel, and for its Complaint against Defendants, 7th Gear Exotics LLC ("7th Gear"), Tiff Cook ("Mr. Cook"), Saththia Lingan ("Mr. Lingan"), ES Exotics LLC ("ES Exotics"), and Ergi Sulejmani ("Mr. Sulejmani"), states and alleges upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters as follows:

## **THE PARTIES**

1.      Plaintiff, Exotic Leasing, LLC ("ELL"), is a limited liability company organized under the laws of Ohio with a principal place of business in Columbus, Ohio. ELL provides funds for the purchase of exotic vehicles for 7th Gear, that in turn leases these vehicles to the general public. ELL is entirely owned by nonparty, Nathaniel Nale ("Mr. Nale").

2.      Defendant, 7th Gear Exotics, LLC ("7th Gear") is a limited liability company organized under the laws of Ohio with a principal place of business in Groveport, Ohio. With funding provided by ELL, 7th Gear agreed to purchase exotic vehicles and lease these vehicles to the general public. 7th Gear has operations in Columbus, Ohio and Tampa, Florida.

3.      Defendant, Tiff A. Cook ("Mr. Cook"), is an individual residing in both Ohio and Florida and is a citizen of Ohio and Florida. Mr. Cook is the sole owner of 7th Gear. On behalf of

7th Gear and in his personal capacity, Mr. Cook entered into certain agreements with ELL for the purchase of exotic vehicles. Mr. Cook's girlfriend and mother of his child is a citizen of Columbia and both Mr. Cook and his girlfriend have significant ties to Columbia, having traveled there recently for over a month in the past year.

4.      Defendant, Saththia Lingan ("Mr. Lingan"), is an individual residing in both Ohio and Florida and is a citizen of Ohio and Florida. Mr. Lingan has represented himself as an independent broker of exotic vehicles, and yet he has a long running and well-established history of title fraud in Ohio, selling or brokering vehicles that he knew he did not have valid title to—accepting the full purchase price and yet failing to deliver titles. Using monies provided by ELL, Mr. Lingan agreed to procure and fully purchase certain vehicles that would be included in the ELL Fleet as described more fully below.

5.      Defendant, ES Exotics LLC ("ES Exotics") is a limited liability company organized under the laws of Ohio with a principal place of business in Canal Winchester, Ohio. ES Exotics is in the exotic car business, buying, selling, and acting as a broker of exotic cars. ES Exotics does business in both Columbus, Ohio and Tampa, Florida.

6.      Defendant, Ergi Sulejmani ("Mr. Sulejmani"), is an individual residing in both Ohio and Florida and is a citizen of Ohio and Florida. Mr. Sulejmani is the sole owner of ES Exotics. On behalf of ES Exotics and in his personal capacity, Mr. Sulejmani participated in the operations of 7th Gear and sold an exotic vehicle to ELL that was supposed to be included in the ELL Fleet.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction in this matter pursuant to 28 U.S.C. §1331 (federal question jurisdiction) as this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

8.      This Court has jurisdiction over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367(a) because they are all part of the same case or controversy.

9.      Venue is proper in the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District, and because certain of the parties agreed to this venue in the applicable agreements.

## BACKGROUND INFORMATION AND FACTS
### *ELL Enters into the ELL Exclusive Fleet Agreement with Mr. Cook and 7th Gear*

10.     Mr. Nale and Mr. Cook have been acquaintances in the central Ohio business community and are exotic vehicle enthusiasts.  Sometime in 2022, Mr. Nale and Mr. Cook began discussing a business arrangement whereby Mr. Nale would provide capital needed to acquire additional exotic vehicles for 7th Gear's inventory.  This subset of exotic vehicles within 7th Gear's inventory would become known as the "ELL Fleet."

11.     Mr. Nale and Mr. Cook agreed on an arrangement whereby Mr. Nale, through a newly formed entity, ELL, would provide funds for the purchase of certain exotic vehicles for Mr. Cook and 7th Gear in exchange for a lien and right to a share in the revenue generated by the leases of these exotic vehicles to the general public.

12.     Mr. Nale formed ELL on or about August 9, 2022, for the purpose of entering into this business arrangement with 7th Gear.  ELL executed an Exclusive Fleet Agreement with Mr. Cook and 7th Gear on or about August 11, 2022, (the "ELL Exclusive Fleet Agreement").  The ELL Exclusive Fleet Agreement is attached here as **Exhibit A**, and among its most essential terms are the following:

   a.  <u>Purchase of Vehicles:</u>  7th Gear unambiguously will use the funds provided by ELL to pay the full purchase price for any particular exotic vehicle and purchase said vehicle free and clear of any previous lien or encumbrance on the vehicle's

title.  The exotic vehicles purchased in this manner would become known as the "ELL Fleet."  ELL Exclusive Fleet Agreement, Section 1.

b. <u>Security Interest:</u>  7th Gear was to hold title in its name and grant to ELL a "a first position lien on the title [to] said vehicle in the full amount of the funds provided by ELL." *Id.*, Section 2.

c. <u>Revenue Sharing; Records; Reporting:</u>  7th Gear will pay to ELL "sixty percent (60%) of the gross revenues generated by each and every vehicle in the ELL Fleet including, without limitation, rental fees, insurance proceeds, and proceeds from the sale of such vehicles."  7th Gear will provide to ELL accurate records on the ELL Fleet. *Id.*, Section 5.

d. <u>ELL Fleet Vehicle Sales:</u>  7th Gear "shall not sell or cause the sale of any vehicle in the ELL Fleet except upon terms approved in advance by ELL," and "ELL shall have the right to cause [7th Gear] to sell any vehicle in the ELL Fleet upon terms approved by ELL…." *Id.*.

e. <u>Exclusivity:</u>  For a period of 3 years, 7th Gear is restricted to only procuring vehicles from ELL and no other source of funding.  *Id.*, Section 6.

13.    Pursuant to the ELL Exclusive Fleet Agreement, beginning on or about August 11, 2022, and continuing through September 27, 2023, ELL wired millions of dollars to 7th Gear for the purchase of 42 exotic vehicles.  When combined with the previously purchased vehicles for which Mr. Nale provided the funds, the ELL Fleet included a total of 45 exotic vehicles by the end of September 2023.

14.    More specifically, in total, ELL (either directly or through Mr. Nale personally or another one of his entities) wired $10,630,478 to 7th Gear from June 14, 2022 through September 27, 2023 for the purchase of vehicles.

15.    The funds were wired from accounts at Huntington National Bank to 7th Gear's accounts.  The wire transfer request forms typically stated the "Purpose for the Wire" and/or the "Special Instructions from OBI" were for the purchase of specific vehicles, identified by make/model and/or VIN.  Over 40 wires were received by 7th Gear in this manner, and the following are a sample:

a. Wire transfer request form (redacted) attached hereto as **Exhibit B** shows the wire of $302,000 from ELL to 7th Gear on February 13, 2023 for the "Purchase" of a "Green Lambo Urus Wide Body LA15330."  The alphanumeric description corresponds with the ending characters of the vehicle's VIN.

b. Wire transfer request form (redacted) attached hereto as **Exhibit C** shows the wire of $330,000 to 7th Gear on February 16, 2023 for the "Vehicle Purchase" of a "22 Rolls Royce Ghost - 209519." Again, the numeric description corresponds with the ending characters of the vehicle's VIN.

c. Wire transfer request form (redacted) attached hereto as **Exhibit D** shows the wire of $235,283.50 to 7th Gear on August 11, 2022 for the "Car Purchase" of a "Ferrari 488 - 213997." Again, the numeric description corresponds with the ending characters of the vehicle's VIN.

16. ELL has evidence for the wiring of all of the funds, including wire transfer request forms for many of them.

17. In 2022, Mr. Cook introduced Mr. Nale to Mr. Lingan. Mr. Lingan represented himself as a seller and broker of high-end supercars and exotic vehicles.

18. Unbeknownst to Mr. Nale and ELL, Mr. Lingan had a long running and well-established history of title fraud in Ohio.

19. In 2018, the Ohio Attorney General ("OAG") identified Mr. Lingan, along with his used car dealership, as defrauding up to 80 customers out of valid title to purchased vehicles. Attached hereto as **Exhibit E** is the OAG's news release related to 2018 civil action ("Columbus Used Car Seller Accused of Failing to Deliver Vehicle Titles to Consumers"). Eventually, in March 2020, Mr. Lingan signed an agreed consent judgment (the "Agreed Consent Judgment") admitting his part to a massive title fraud scheme strikingly similar to the one at issue here.

20. At all times relevant to this action, Mr. Lingan represented to Mr. Nale and ELL that Mr. Lingan had access to, or could procure, the exotic vehicles ELL desired to include in the ELL Fleet. Furthermore, Mr. Lingan represented that he could provide these vehicles to 7th Gear for inclusion in the ELL Fleet with valid titles and with no prior liens.

21. As such, Mr. Lingan was intimately involved in the procurement and purchase of these vehicles on behalf of 7th Gear. ELL had invested over $10 Million into the ELL Fleet, the entirety of which was under the custody and control of Mr. Cook and 7th Gear. However, as

discussed in more detail below, Mr. Lingan in a brazen scheme with Mr. Cook and others, accepted ELL's purchase monies but did not actually purchase the vehicles as instructed by ELL.

22.     Initially, and through July 2023, Mr. Cook and 7th Gear appear to have honored the 60% revenue sharing provision of the ELL Exclusive Fleet Agreement (at least in part) by providing ELL Fleet rental revenue financial reports and monies to ELL.

23.     However, in late 2023—after ELL paused providing funds to 7th Gear, Mr. Cook and 7th Gear ceased making revenue sharing payments to ELL and refused requests from Mr. Nale to sell certain vehicles in the ELL Fleet because of alleged title issues.  Mr. Nale became concerned about his investment in the ELL Fleet, and the parties entered into negotiations to amend the ELL Exclusive Fleet Agreement.

24.     As of December 2023, Mr. Cook and 7th Gear had breached the ELL Exclusive Fleet Agreement in, *inter alia*, the following ways:

    a.  Failing to pay ELL its share of the gross revenues generated by the ELL Fleet, which are due on or before the 15th day of the month after the revenues were generated or, in the event of a sale or insurance casualty, on the date of said sale or casualty;

    b.  Failing to provide ELL with written evidence of the first position lien granted to ELL on all vehicles in the ELL Fleet;

    c.  Selling or otherwise transferring vehicles in the ELL Fleet without informing ELL;

    d.  Failing to provide data to ELL to document the operations of the ELL Fleet; and

    e.  Failing to provide ELL with unlimited access to the vehicle tracking software for the ELL Fleet.

### *Mr. Cook and 7th Gear Propose the First Amendment to Address their Prior Breaches of the ELL Exclusive Fleet Agreement*

25.     Because Mr. Cook and 7th Gear sold ELL Fleet vehicles without ELL's consent and was not sharing revenue or reporting as agreed, Mr. Nale sought to clarify exactly which vehicles were now included in the ELL Fleet in order to ensure his investment was properly secured and protected.  Accordingly, Mr. Cook and 7th Gear proposed a "new list" of vehicles that were now in

the ELL Fleet, with respect to which they represented they had proper documentation.  Mr. Nale also wanted to clarify the exact amount due to him and certainty on his first position lien on the vehicles in the ELL Fleet.

26.     Accordingly, ELL executed the First Amendment to the Exclusive Fleet Agreement with Mr. Cook and 7th Gear on or about December 28, 2023, (the "First Amendment").  A copy of the First Amendment is attached here as **Exhibit F**.

27.     The First Amendment included as Exhibit A a table prepared by 7th Gear itemizing the specific 48 exotic vehicles in the ELL Fleet by year, make, model, VIN, color and current market value (the "Asset Allocation Table").  It also clarified that Mr. Nale's investment in the ELL Fleet (including amounts owed to him for missed revenue-sharing payments) was $11,495,226. Mr. Cook and 7th Gear agreed to repay that amount, and confirmed that ELL had a first position lien on all the vehicles in the ELL Fleet.  Unbeknownst to Mr. Nale, a number of the vehicles on the Asset Allocation Table had already been encumbered by various liens and many were not actually titled to 7th Gear.

28.     After the First Amendment, Mr. Cook and 7th Gear continued their wrongdoing, failing to deliver evidence of ELL's first lien position and retaining 100% of the revenue generated by the ELL Fleet.

29.      According to reports provided to ELL by Mr. Cook and 7th Gear, the ELL Fleet generated at least $496,035 in gross revenue in December 2023, at least $545,994 in gross revenue in February 2024, and at least $544,170 in gross revenue in March 2024.  True and accurate copies of said reports are attached hereto as **Exhibit G1** to **Exhibit G3**.

30.     As a result, ELL was due over $840,000 in revenue sharing (60% of December's gross revenue and 50% of February and March's gross revenue) for those three months alone.

31.     However, the parties continued to disagree about various other terms, including Mr. Cook and 7th Gear's complaints about ELL's share of the revenue, and the parties entered into negotiations for a second amendment to the ELL Exclusive Fleet Agreement.

### *ELL Executes the Second Amendment to the ELL Exclusive Fleet Agreement with Mr. Cook and 7th Gear*

32.     Complaining that the revenue sharing agreed to was not fair, Mr. Cook and 7th Gear sought to reduce ELL's revenue sharing percentage from 60% to 50% and sought to be released from certain restrictions of the exclusivity provisions.

33.     Accordingly, ELL executed the Second Amendment to the Exclusive Fleet Agreement with Mr. Cook and 7th Gear on or about January 23, 2024, (the "Second Amendment"). A copy of the Second Amendment is attached here as **Exhibit H**.

34.     In spite of this, 7th Gear and Mr. Cook continued to refuse to pay ELL the amounts due under the Agreement.

35.     Prior to the execution of the First Amendment, Mr. Cook and 7th Gear paid ELL at least some portion of the revenue sharing due to ELL under the ELL Exclusive Fleet Agreement.

36.     After the execution of the First Amendment, Mr. Cook and 7th Gear have failed and refused to pay *any* of the $11,495,226 they agreed was due to ELL, or *any* of the revenue sharing due to ELL.

37.     In an effort to recoup his losses, ELL received $670,000 in funds directly from Mr. Lingan for sales of certain vehicles from January through March 2024. This was with full knowledge of Mr. Cook and 7th Gear and in exercise of ELL's rights under Section 5 of the ELL Exclusive Fleet Agreement to cause the sale of vehicles in the ELL Fleet.

### *April 29, 2024 Demand Letter*

38.     From January through April 2024, ELL made several attempts to get documentation on the ELL Fleet vehicles and receive revenue payments to no avail.

39. On April 29, 2024, through counsel, ELL provided to Mr. Cook and 7th Gear a demand letter detailing the various defaults under the agreements in an effort resolve the dispute. A copy of the April 29, 2024 demand letter is attached here as **Exhibit I**.

40. 7th Gear refused to provide any information or payments in response to the demand letter.

41. Aside from an initial few, Mr. Cook and 7th Gear have refused to provide the titles to the vehicles in the ELL Fleet, or evidence of ELL's first-position liens on said titles.

42. As late as last month, Mr. Cook affirmed to Mr. Nale that the funds that were owed were to be paid soon, at least in part, through funds to be obtained from a line of credit being obtained by Mr. Cook and his father through OUCU Financial.

### *Investigation and Discovery of Fraudulent Scheme* ### *(ELL Fleet Vehicles are Liened, Sold, Marketed for Sale and Revenue is not Shared)*

43. ELL has recently uncovered evidence that 7th Gear, Mr. Cook, and Mr. Lingan fraudulently represented the status of title to many of the vehicles in the ELL Fleet.

44. Additionally, it appears from publicly available information that there are liens on many of the vehicles in the ELL Fleet, that 7th Gear does not even have the title to many of the vehicles in the ELL Fleet, all in contradiction to the ELL Exclusive Fleet Agreement.

### *Mr. Sulejmani and ES Exotics Conspire with Mr. Cook and 7th Gear to Defraud and Deprive* ### *ELL of its Property and Rights*

45. Mr. Sulejmani is Mr. Cook's oldest friend and closest advisor.

46. Mr. Sulejmani either directly and/or through ES Exotics participated directly in the operations and decision-making process for 7th Gear.

47. Mr. Sulejmani and ES Exotics conspired with 7th Gear to deprive ELL of its right to be the exclusive provider of funds to purchase vehicles for 7th Gear. ELL Exclusive Fleet Agreement, Section 6.

48.     In contravention to the ELL Exclusive Fleet Agreement, Mr. Sulejmani and ES Exotics provided one or more vehicles to 7th Gear for rental to the general public.

49.     When this scheme was uncovered by ELL, Defendants agreed that ELL could *purchase* one of the offending automobiles, a 2022 Corvette, from Mr. Sulejmani and ES Exotics, and put it in the ELL Fleet.

50.     On or about June 30, 2023, ELL wired $100,000 to ES Exotics for purchase of the 2022 Corvette.

51.     Mr. Sulejmani and ES Exotics refused to deliver the title to the vehicle to ELL, or to put the vehicle in the ELL Fleet.

52.     To this day, Defendants have failed to deliver the title to the vehicle to 7th Gear and secure a first position lien notation to ELL, or to put the vehicle in the ELL Fleet.

### *Mr. Lingan Conspires with Mr. Cook and 7th Gear to Defraud and Deprive ELL of its Property and Rights*

53.     Mr. Lingan knew that ELL was providing 100% of the purchase price of the vehicles in the ELL Fleet to 7th Gear, and conspired with 7th Gear and Mr. Cook to perpetrate this massive fraudulent scheme against ELL.

54.     Mr. Lingan knew that ELL had provided at least $9 million to 7th Gear to purchase vehicles.

55.     For example, on April 16, 2024, in an effort to further advance and conceal the fraud against ELL, Mr. Cook sent an email to Mr. Lingan, copying Mr. Nale, and stating as follows:

> Due to the past due balance due to 7GE from months of short-term lease deals, and that 7GE has not been able to obtain titles to certain cars purchased over the past year(s), Sath has suggested we purchase new inventory that is equal to the purchase price of certain vehicles we have had trouble obtaining title to referenced below as "return vehicles". Sath has been sending new inventory to 7GE listed below "hold vehicles".

56. This email was nothing more than an attempt to further defraud ELL, as both Mr. Lingan and Mr. Cook knew that one of the reasons Mr. Lingan was unable to obtain titles for 7th Gear was that the full purchase price of the vehicles was being diverted for other uses.

57. The email further stated, "Both parties [Mr. Lingan and 7th Gear] have agreed to accept the original purchase price as available credit on new inventory."

58. But, "both parties" knew that the original purchase price – which was provided in full by ELL – was diverted by Defendants for other uses.

59. Mr. Nale, however, did not know the truth, and this email was just one example of Mr. Lingan and Mr. Cook and 7th Gear working together to advance and extend their scheme to defraud Mr. Nale.

60. Mr. Lingan did not respond and explain to Mr. Cook that of course no titles were provided because the funds provided by ELL were diverted by Defendants for other uses.

61. Mr. Lingan did not reach out to Mr. Nale and tell the truth.

62. Mr. Lingan was participating in the fraud.

63. Just like the substitution of vehicles accomplished by the First Amendment, this was another "swap out" of vehicles to avoid revealing the vast fraud engaged in by Defendants.

64. On or about February 16, 2024, Mr. Lingan represented to Mr. Nale in an electronic message that titles to the following vehicles were "ready to transfer":

    a. 2022 Maserati MC20 - 214414

    b. 2022 McLaren GT - 001903

    c. 2022 Lamborghini Urus - A18272

    d. 2022 Rolls-Royce Cullinan - 214414

    e. 2021 Mercedes-Benz GLS600 - 401983

65.     In the same February 16, 2024 message, Mr. Lingan represented to Mr. Nale that titles to the following vehicles were "pending within a few days to [a] few weeks":

    a.   2022 Ferrari 812 Superfast - 239674

    b.   2021 Ferrari Roma - 268704

    c.   2021 Rolls-Royce Cullinan - 204623

    d.   2021 Lamborghini Huracan Spyder - A16205

    e.   2022 Cadillac Escalade - 255049

    f.   2022 Cadillac Escalade - 166447

66.     All of these vehicles appear to correspond to vehicles in the ELL Fleet per the Asset Allocation Table based on their descriptions and last few digits of the VINs.

67.     But, neither ELL or Mr. Nale has not been provided with evidence of his liens on these titles, and has been prevented from exercising his right to sell these vehicles and receive the proceeds.

68.     Mr. Lingan also participated with Mr. Cook and 7th Gear in defrauding ELL through "short term" leases that he allegedly arranged with third parties, and requested ELL through 7th Gear to fund the purchase of vehicles to so lease.

69.     Like the rest of the vehicles, these vehicles were not actually purchased by 7th Gear with clean titles, if at all.

70.     Further, Mr. Lingan did not pay to ELL or 7th Gear the rental proceeds from these vehicles.

71.     Mr. Lingan received a "spiff" in the amount of several thousand dollars for each vehicle allegedly purchased by 7th Gear with funds provided by ELL, giving him a clear financial incentive to close these "sales" whether they were legitimate or fraudulent.

72.     Defendants acted illegally and with reckless disregard to ELL's rights, interests, and well-being.  Defendants' conduct threatens the future of ELL and its business.  Unless injunctive relief is granted, ELL will suffer irreparably injury and be unable to operate its business and meet its obligations, resulting in damage to its business and reputation that are impossible to measure at this time as well as permanently damaging it.

73.     Furthermore, Defendants actions and attempts to sell the already moveable vehicles and convert them into cash in violation of the applicable agreement threatens Plaintiff with irreparable injury, especially given the unique and exotic nature of the vehicles.

74.     Now, ELL seeks enforcement of its agreement with Mr. Cook and 7th Gear, recovery of his property and funds, injunctive relief and any and all other relief and damages resulting from Defendants' egregious and wrongful actions.

**COUNT ONE**
**18 U.S.C. § 1962(c) Civil RICO (Racketeer Influenced Corrupt Organizations)**
**Against All Defendants**

75.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

76.     Defendants are individuals and/or entities capable of holding a legal or beneficial interest in property, within the meaning of "person" as that term is defined in 18 U.S.C. § 1961(3).

77.     Defendants constitute an association in fact under the meaning of "enterprise" as that term is defined in 18 U.S.C § 1961(4).  Additionally or alternatively, 7th Gear and ES Exotics constitute an "enterprise" under 18 U.S.C. § 1961(4).

78.     Defendants associated together as an enterprise for the purpose of executing a scheme to defraud Plaintiff through a pattern of racketeering consisting of distinct acts of wire fraud and money laundering in violation of 18 U.S.C. §§ 1343 and 1956.

79.     Mr. Cook and 7th Gear participated in the enterprise by, among other things: devising and participating in a scheme with Defendants Mr. Lingan, ES Exotics and Mr. Sulejmani designed

to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally, Mr. Lingan, and to Mr. Sulejmani's own company or to himself personally. Mr. Cook further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; repeatedly diverting monies provided by Plaintiff for the purchase of exotic vehicles and from the revenue generated by said vehicles for his personal gain; and creating and causing to be created false financial reports, emails, contracts, and subcontracts to further the scheme.

80.     Mr. Lingan participated in the enterprise by, among other things:  devising and participating in a scheme with Defendants Mr. Cook and 7th Gear designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally and Mr. Lingan.  Mr. Lingan further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement and by Mr. Lingan's representations to ELL; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; either participating in or concealing the diversion of monies provided by Plaintiff for the purchase of exotic vehicles and from the revenue generated by said vehicles; and creating and causing to be created false communications to further the scheme.

81.     Mr. Sulejmani and ES Exotics participated in the enterprise by, among other things: devising and participating in a scheme with Defendants 7th Gear and Mr. Cook designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally and to Mr. Sulejmani's own company or to himself personally.  Mr. Sulejmani further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase one or more exotic vehicles as was required by the ELL Exclusive Fleet Agreement; failing to transfer title to one or more of the exotic vehicles purchased with funds provided by Plaintiff; diverting monies provided by Plaintiff for the purchase of exotic vehicles for his personal gain; creating and causing to be created false communications to further the scheme.

82.     Defendants' scheme to defraud Plaintiff injured Plaintiff in an amount greater than $11 Million.

**COUNT TWO**
**FRAUDULENT CONCEALMENT**
**Against all Defendants**

83.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

84.     As a party to the business transaction between ELL on the one side, and Defendants on the other side, Defendants had a duty to disclose to ELL, among other things, the following: that they did not receive or furnish titles to the vehicles allegedly purchased with ELL's funds, that they were diverting ELL's funds for uses not authorized by ELL, and that they were unable to grant the liens as agreed.  This information was material to ELL's business relationship with Defendants because ELL would not have entered into or continued a business relationship with Defendants with this knowledge.

85.     Mr. Cook and 7th Gear, with the assistance, participation, and cooperation of Mr. Lingan, ES Exotics, and Mr. Sulejmani, intentionally concealed the above material information from

ELL in order to induce ELL into entering into a business relationship with Mr. Cook and 7th Gear and investing over $10 Million for the purchase of dozens of exotic vehicles.

86.     ELL justifiably relied on Mr. Cook and 7th Gear in entering into and continuing the business relationships with Mr. Cook, 7th Gear, Mr. Lingan, ES Exotics, and Mr. Sulejmani because it had no knowledge of the private agreements between Defendants to defraud it and could not have obtained that knowledge absent Defendants' confessions.

87.     As a result of Mr. Cook, 7th Gear, Mr. Lingan, ES Exotics, and Mr. Sulejmani's concealment of material facts concerning the multiple exotic vehicle transactions, ELL suffered damages in an amount greater than $11 Million.

**COUNT THREE**
**FRAUDULENT MISREPRESENTATION**
**Against all Defendants**

88.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

89.     Defendants Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics made material misrepresentations to ELL from June 2022 through May 2024, regarding the purchase of exotic vehicles with funds provided by ELL, and the revenue generated by these vehicles.  At the time, Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics had an off-the-books deal with each other to receive funds or other benefits from ELL without providing vehicle titles.

90.     Mr. Lingan represented that he was able to provide clean titles to the vehicles represented as being purchased with ELL's funds, that vehicles were being rented through "short term" leases that he allegedly arranged with third parties, and requested ELL through 7th Gear to fund the purchase of vehicles to so lease, despite either not paying all of the rental payments received to 7th Gear or representing that leases occurred when they did not or were not paying leases.

91.     Mr. Cook made material misrepresentations to ELL by creating and sending to ELL numerous fabricated and/or wholly false financial reports detailing 7th Gears' grossly inflated vehicle rental revenue figures in order to cover up his and the other co-conspirators' scheme.

92.     Defendants made the above representations with knowledge of their falsity and/or with such utter disregard and recklessness as to whether they were true or false that such knowledge may be inferred.

93.     Defendants made representations with the intent of misleading ELL into relying upon them and continuing in the business transactions with Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics.

94.     ELL justifiably relied on the representations.

95.     ELL was directly and proximately injured as a result of their reliance on Defendants representations in an amount greater than $11 Million.

**COUNT FOUR**
**CIVIL ACTION FOR CRIMINAL THEFT (R.C. §§ 2307.60, 2307.61)**
**Against all Defendants**

96.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

97.     By stealing money from ELL, Defendants, Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics have committed a theft offense under Ohio law.

98.     Defendants, with a purpose to deprive ELL of the funds, knowingly obtained and exerted control over the funds with ELL's consent and beyond the scope of the express or implied consent ELL gave Defendants, and by deception.

99.     Mr. Cook did not have ELL's permission to transfer funds to Mr. Lingan under the circumstances alleged herein, in which Mr. Lingan, using ELL's funds, procured exotic vehicles he knew he was unable to provided titles for.

100.     Defendants, Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics all exerted control over ELL's funds beyond the scope of the express or implied consent ELL gave them, insofar as ELL provided funds with the expectation that the funds would be used to purchase vehicles with valid titles and, with respect to revenue generated by said vehicles, to receive its proper share of said revenue.  As described herein, Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics took steps to induce and actively conceal their scheme from ELL.

101.     As a result of Defendants' theft of the funds, ELL suffered damages in an amount greater than $11 Million.

**COUNT FIVE**
**CIVIL ACTION FOR CRIMINAL ACT OF**
**TELECOMMUNICATIONS FRAUD (R.C. § 2913.05)**
**Against all Defendants**

102.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

103.     Defendants, having devised a scheme to defraud, knowingly transmitted by means of a telecommunications device a writing with the purpose to execute or otherwise further the scheme to defraud.

104.     As detailed above, Defendants, Mr. Cook, Mr. Lingan, and Mr. Sulejmani, communicated via text message, WhatsApp, and email throughout the relevant time period to act on behalf of 7th Gear and ES Exotics as part of their scheme to defraud ELL.  By way of example:

   a.  Mr. Cook and Mr. Lingan messaged each other over text message to discuss procuring exotic vehicles using ELL funds that both knew did not have valid titles.

   b.  Mr. Cook and Mr. Sulejmani messaged each other over text message to discuss using ELL funds to purchase a 2022 Corvette.

   c.  Mr. Cook used his email to send to Mr. Nale fraudulent financial reports created in Microsoft Excel in an effort to further conceal his fraud.

   d.  Mr. Lingan and Mr. Cook used electronic messaging to represent to Mr. Nale that certain titles were in hand or coming, when either they were not or they were already encumbered by liens from third parties in violation of the ELL Exclusive Fleet Agreement.

105. Defendants, Mr. Cook, 7th Gear, Mr. Lingan, Mr. Sulejmani, and ES Exotics communicated via text message and WhatsApp to avoid detection of their fraudulent scheme.

106. As a result of Defendants' theft of the funds, ELL suffered damages in an amount greater than $11 Million.

**COUNT SIX**
**BREACH OF CONTRACT**
**Against Mr. Cook and 7th Gear**

107. Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

108. The ELL Exclusive Fleet Agreement (including all of its amendments) is a valid contract between Plaintiff, ELL, and Defendants, Mr. Cook and 7th Gear.

109. Plaintiff, ELL, fully performed its obligations under the contract.

110. Using monies provided by ELL, among other terms, the contract requires Mr. Cook and 7th Gear to purchase exotic vehicles free and clear of any liens or encumbrances. The contract also requires Mr. Cook and 7th Gear to grant to ELL a first position lien on all vehicles purchased with ELL funds.

111. Among other terms, the contract also requires Mr. Cook and 7th Gear to provide revenue sharing and real time data on the ELL Fleet segregated by vehicle.

112. Mr. Cook and 7th Gear breached the contract by, among other things, failing to purchase vehicles with clear titles, failing to add Plaintiff to the vehicles as first position lien holders, failing to provide documentation, failing to provide revenue sharing, failing to honor the exclusivity provision, failing to return any of the monies due to ELL pursuant to the First Amendment, and failing to provide ELL with access to the ELL Fleet.

113. As a direct and proximate cause of Mr. Cook and 7th Gear's breaches of the contract, Plaintiff have suffered damages greater than $11 Million.

**COUNT SEVEN**
**BREACH OF CONTRACT**

**Against Mr. Lingan**

114.    Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

115.    ELL and Mr. Lingan formed a valid oral contract for the purchase of over $9 Million worth of exotic vehicles with clear titles and for short term rental placements of certain vehicles.

116.    Plaintiff, ELL fully performed its obligations under the contract.

117.    Using monies provided by Plaintiff, among other terms, the contract requires Mr. Lingan to purchase exotic vehicles free and clear of any liens or encumbrances. The contract also requires Mr. Lingan to provide titles capable of granting to ELL a first position lien on all vehicles purchased with ELL funds, and to provide short-term rental placements.

118.    Mr. Lingan breached the contract by, among other things, failing to purchase vehicles with clear titles, failing to add Plaintiff to the vehicles as first position lien holders, and failing to provide any titles at all, and failing to pay the proceeds from the short term rental placements.

119.    As a direct and proximate cause of Mr. Lingan's breaches of the contract, Plaintiff have suffered damages greater than $11 Million.

## COUNT EIGHT
## BREACH OF CONTRACT
### Against Mr. Sulejmani and ES Exotics

120.    Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

121.    Plaintiff, ELL, and Defendants, Mr. Sulejmani and ES Exotics, formed a valid oral contract for the purchase of 2022 Corvette to include in the ELL Fleet.

122.    Plaintiff, ELL, fully performed its obligations under the contract, including paying the purchase price to ES Exotics.

123.    Mr. Sulejmani and ES Exotics breached the contract by, among other things, failing to provide a valid title, failing to add ELL to the vehicle as first position lien holders, and failing to provide documentation on the 2022 Corvette.

124.    As a direct and proximate cause of Mr. Sulejmani and ES Exotics' breaches of the contract, Plaintiff have suffered damages greater than $100,000.

**COUNT NINE**
**UNJUST ENRICHMENT**
**Against all Defendants**

125.    Plaintiff repeat and reallege the allegations set forth above as if fully restated herein.

126.    As a result of the acts and/or omissions set forth above, Defendants received benefits from Plaintiff in the form of misappropriated funds totaling more than $11 Million.

127.    As a result of the acts and/or omissions set forth above, Defendants have been unjustly enriched.

128.    The benefits received were procured by fraud, through conspiracy, theft, and in bad faith.

129.    Plaintiff are entitled to recover as damages the value of Defendants' enrichment in the amount of no less than $11 Million.

130.    The acts and/or omissions of each Defendant were deliberate, intentional, knowing, willful, reckless, and/or malicious and demonstrates malice and aggravated or egregious fraud.

**WHEREFORE**, Plaintiff under all counts of the Complaint requests the Entry of Judgment for the following relief:

A.  Compensatory damages, jointly and severally from all Defendants, in an amount greater than $75,000;

B.  A temporary restraining order and a preliminary and permanent injunction to enjoin Defendants from selling or placing any lien on any of the vehicles in 7th Gears's possession, custody, or control;

C.  A temporary restraining order and a preliminary injunction to enjoin Defendants from using, converting, transferring, or disposing of any of their assets, including any vehicles located in Ohio or Florida;

D.  A temporary restraining order and a preliminary injunction to order Defendants to provide information about the funds provided by ELL, due to ELL, and/or received or spent by Defendants;

E.   Prejudgment attachment of funds and vehicles;

F.   Pre-judgment and post-judgment interest;

G.   Punitive damages jointly and severally from all Defendants;

H.   Attorneys' fees and costs to prosecute this action; and

I.   Award such other and further relief as may be just and proper.

Respectfully submitted,

PETERSON CONNERS LLP                         ROBERT HUFF MILLER LLC

_s/ Istvan Gajary_____                 _s/ Robert Huff Miller by s/ Istvan Gajary per email
GREGORY S. PETERSON (0061915) Trial Attorney     authority
ISTVAN GAJARY (0089084)                          ROBERT HUFF MILLER (0076939) Trial Attorney
545 Metro Place South, Suite 435                 100 East Broad Street, Suite 230
Dublin, Ohio 43017                               Columbus, Ohio 43215
Telephone: 614.365.7000                          Telephone: 614.384.5794
Facsimile: 614.220.0197                          E-mail: rob@roberthuffmiller.com
E-mail: gpeterson@petersonconners.com
E-mail: igajary@petersonconners.com                  *Counsel for Plaintiff*

   *Co-Counsel for Plaintiff*


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable under law.

_s/ Istvan Gajary_____
ISTVAN GAJARY

**VERIFICATION**

STATE OF OHIO                )
COUNTY OF FRANKLIN    )SS.

Nathaniel Nale, as sole member of Plaintiff, Exotic Leasing, LLC, who being first duly sworn, deposes and states that he has read the foregoing Verified Complaint; that this verification is based upon his own knowledge, information, and belief; and that he believes the allegations in the foregoing Verified Complaint to be true to the best of his knowledge, information, and belief.

NATHANIEL NALE

Sworn to and subscribed before me, this 27 day of May, 2024.

CATHERINE J SCHWARTZ
Notary Public
In and for the State of Ohio
My Commission Expires
October 24, 20 28

Notary Public