**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **EXOTIC LEASING, LLC** | ) | |
| 100 East Broad Street, Suite 230 | ) | |
| Columbus, Ohio 43215, | ) | Case No. 2:24-CV-03036 |
| | ) | |
| *Plaintiff,* | ) | Judge James L. Graham |
| *v.* | ) | |
| | ) | Magistrate Judge Elizabeth P. Deavers |
| **7TH GEAR EXOTICS LLC**, *et al.* | ) | |
| 5650 Groveport Road | ) | JURY DEMAND |
| Groveport, Ohio 43125, | ) | ENDORSED HEREON |
| | ) | |
| *Defendants.* | ) | |

<u>**SECOND AMENDED COMPLAINT**</u>

This *Second Amended Complaint* details a massive and brazen title fraud operation spanning two states and over 48 exotic supercars worth over $10 million dollars, including numerous Lamborghinis, Rolls Royces, McLarens, Ferraris, Porsches, and others. The multiple Defendants conspired together to defraud Plaintiff of its multimillion-dollar investment through a coordinated effort of fabricated documents, false promises, and fraudulent titles. Instead of purchasing vehicles with over $10 million invested by Plaintiff, granting the titles and liens, and paying the revenue share as expressly agreed, Defendants simply financed or otherwise secured cars, without titles, represented them as being purchased, and then disposed of them realizing a substantial windfall.

Plaintiff, Exotic Leasing, LLC ("ELL"), by and through its undersigned counsel, and for its Complaint against Defendants, Cunix Automotive Group, LLC d.b.a., the Toy Barn ("Toy Barn"), Shawn P. Cunix ("Mr. Cunix"), 7th Gear Exotics LLC ("7th Gear"), T Cook Holdings LLC ("T Cook"), Tiff A. Cook ("Mr. Cook"), Stephen A. Richardson ("Mr. Richardson"), Tiff J. Cook, Sr. ("Mr. Cook, Sr."), ES Exotics LLC ("ES Exotics"), and Ergi Sulejmani ("Mr.

Sulejmani"), states and alleges upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters as follows:

<u>**THE PARTIES**</u>

1.      Plaintiff, Exotic Leasing, LLC ("ELL"), is a limited liability company organized under the laws of Ohio with a principal place of business in Columbus, Ohio. ELL provides funds for the purchase of exotic vehicles for 7th Gear, that in turn leases these vehicles to the general public. ELL is entirely owned by nonparty, Nathaniel Nale ("Mr. Nale").

2.      Defendant, Cunix Automotive Group, LLC, d.b.a. the Toy Barn ("Toy Barn) is a limited liability company organized under the laws of Ohio with a principal place of business in Dublin, Ohio. The Toy Barn provided exotic vehicles to 7th Gear for purchase (or what was represented to ELL as a purchase) with funding provided by ELL. The Toy Barn has operations in Dublin, Ohio.

3.      Defendant, Shawn P. Cunix ("Mr. Cunix"), is an individual residing in both Ohio and Florida and is a citizen Ohio and Florida. Mr. Cunix is the sole owner of the Toy Barn (Cunix Automotive Group, LLC). On behalf of the Toy Barn and in his personal capacity, Mr. Cunix sold numerous exotic vehicles to 7th Gear that were supposed to be included in the ELL Fleet.

4.      Defendant, 7th Gear Exotics, LLC ("7th Gear") is a limited liability company organized under the laws of Ohio with a principal place of business in Groveport, Ohio. With funding provided by ELL, 7th Gear agreed to purchase exotic vehicles from the Toy Barn and others and lease these vehicles to the general public. 7th Gear has operations in Columbus, Ohio and Tampa, Florida.

5.      Defendant, Tiff A. Cook ("Mr. Cook"), is an individual residing in both Ohio and Florida and is a citizen of Ohio and Florida. Mr. Cook is the sole owner of 7th Gear. On behalf of 7th Gear and in his personal capacity, Mr. Cook entered into certain agreements with ELL for the

purchase of exotic vehicles. Mr. Cook's girlfriend and mother of his child is a citizen of Columbia and both Mr. Cook and his girlfriend have significant ties to Columbia, having traveled there for over a month in the past year.

6. Defendant, Stephen A. Richardson ("Mr. Richardson"), is an individual residing in Florida and is a citizen of Florida. Mr. Richardson was employed by or was an independent contractor of 7th Gear. Mr. Richardson provided business coaching advice to Mr. Cook and on behalf of 7th Gear, Mr. Richardson participated in the operations of 7th Gear and produced fraudulent documents related to the ELL Fleet.

7. Defendant, Tiff J. Cook, Sr. ("Mr. Cook, Sr."), is an individual residing in both Ohio and Florida and is a citizen of Ohio and Florida. Mr. Cook, Sr. is the father of Mr. Cook. Mr. Cook Sr. participated in the operations of 7th Gear and transferred an exotic vehicle to himself that was purchased with funds provided by ELL and was supposed to be included in the ELL Fleet.

8. Defendant, ES Exotics LLC ("ES Exotics") is a limited liability company organized under the laws of Ohio with a principal place of business in Canal Winchester, Ohio. ES Exotics is in the exotic car business, buying, selling, and acting as a broker of exotic cars. ES Exotics does business in both Columbus, Ohio and Tampa, Florida.

9. Defendant, Ergi Sulejmani ("Mr. Sulejmani"), is an individual residing in both Ohio and Florida and is a citizen of Ohio and Florida. Mr. Sulejmani is the sole owner of ES Exotics. On behalf of ES Exotics and in his personal capacity, Mr. Sulejmani participated in the operations of 7th Gear and sold an exotic vehicle to ELL that was supposed to be included in the ELL Fleet.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction in this matter pursuant to 28 U.S.C. §1331 (federal question jurisdiction) as this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

11.     This Court has jurisdiction over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367(a) because they are all part of the same case or controversy.

12.     Venue is proper in the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District, and because certain of the parties agreed to this venue in the applicable agreements.

## BACKGROUND INFORMATION AND FACTS
### *ELL Enters into the ELL Exclusive Fleet Agreement with Mr. Cook and 7th Gear*

13.     Mr. Nale and Mr. Cook have been acquaintances in the central Ohio business community and are exotic vehicle enthusiasts. Sometime in 2022, Mr. Nale and Mr. Cook began discussing a business arrangement whereby Mr. Nale would provide capital needed to acquire additional exotic vehicles for 7th Gear's inventory. This subset of exotic vehicles within 7th Gear's inventory would become known as the "ELL Fleet."

14.     At around this same time and in coordination with Mr. Cook, Mr. Nale discussed the purchase of the first vehicles for the ELL Fleet from Mr. Cunix and the Toy Barn. In a series of text messages including Mr. Nale, Mr. Cunix, and Mr. Cook, beginning on June 7, 2022, Mr. Cunix explained the terms of the purchase of the vehicles identified as Overt Act A and Overt Act B detailed below. In those text exchanges, Mr. Cunix demanded $25,000 cash as part of the sale apart from the purchase price of the vehicles.

15.     Mr. Nale and Mr. Cook agreed on an arrangement whereby Mr. Nale, through a newly formed entity, ELL, would provide funds for the purchase of certain exotic vehicles for Mr. Cook and 7th Gear in exchange for a lien and right to a share in the revenue generated by the leases of these exotic vehicles to the general public.

- 4 -

16.     Once Mr. Cook secured the funding arrangement from ELL and Mr. Nale, Mr. Cook, Mr. Cunix, Person A, and Person B arranged for a meeting to discuss the particulars of a scheme to defraud ELL and Mr. Nale out of $10 million.

17.     On July 11, 2022, Mr. Cook, Mr. Cunix, Person A, and Person B exchanged a series of text messages arranging a meeting for the following day stating "Good morning gents  Can we all fly in tomorrow morning ?  I will find an Airbnb for all of us so we can just be locked into it together.  No distractions"  That message is shown in Figure 1 below:

Figure 1



18.     The following day, on the same text thread including the same individuals, Mr. Cunix states "I got tablets and pins and I bought a white board and I have the downstairs of my house to

work from with others not being there during." Mr. Cunix further requests Mr. Cook to "email me the vin and miles on all your cars asap" which includes ELL and Mr. Nale's ELL Fleet vehicles. That message is shown in Figure 2 below:

Figure 2



19. On information and belief, it was at this July 12, 2022, meeting that Mr. Cunix, Mr. Cook, Person A, and Person B developed the specific details of the plan to defraud ELL and Mr. Nale of millions of dollars through a complex series title transfers between the Toy Barn, 7th Gear, various entities owned or controlled by Person A, and other related entities. A substantial number of vehicles identified in Overt Acts A through Overt Act NN end up titled to the Toy Barn. After retaining title, Mr. Cunix and the Toy Barn proceeded to sell the vehicles on the open market to the

public realizing substantial profits.  As to many of these vehicles, the Toy Barn sold the same vehicles ***TWICE:*** once to 7th Gear using funds provided by ELL, and again to a traditional retail buyer.

20.     Mr. Nale formed ELL on or about August 9, 2022, for the purpose of entering into this business arrangement with 7th Gear.  ELL executed an Exclusive Fleet Agreement with Mr. Cook and 7th Gear on or about August 11, 2022, (the "ELL Exclusive Fleet Agreement").  The ELL Exclusive Fleet Agreement is attached here as **Exhibit A**, and among its most essential terms are the following:

A.  Purchase of Vehicles:  7th Gear unambiguously will use the funds provided by ELL to pay the full purchase price for any particular exotic vehicle and purchase said vehicle free and clear of any lien or encumbrance on the vehicle's title.  The exotic vehicles purchased in this manner would become known as the "ELL Fleet."  ELL Exclusive Fleet Agreement, Section 1.

B.  Security Interest:  7th Gear was to hold title in its name and grant to ELL a "a first position lien on the title [to] said vehicle in the full amount of the funds provided by ELL." *Id.*, Section 2.

C.  Revenue Sharing; Records; Reporting:  7th Gear will pay to ELL "sixty percent (60%) of the gross revenues generated by each and every vehicle in the ELL Fleet including, without limitation, rental fees, insurance proceeds, and proceeds from the sale of such vehicles."  7th Gear will provide to ELL accurate records on the ELL Fleet.  *Id.*, Section 5.

D.  ELL Fleet Vehicle Sales:  7th Gear "shall not sell or cause the sale of any vehicle in the ELL Fleet except upon terms approved in advance by ELL," and "ELL shall have the right to cause [7th Gear] to sell any vehicle in the ELL Fleet upon terms approved by ELL…." *Id.*.

E.  Exclusivity:  For a period of 3 years, 7th Gear is restricted to only procuring vehicles with funds provided by ELL and no other source of funding. *Id.*, Section 6.

21.     Pursuant to the ELL Exclusive Fleet Agreement, beginning on or about August 11, 2022, and continuing through September 27, 2023, ELL wired millions of dollars to 7th Gear for the purchase of 42 exotic vehicles.  When combined with the previously purchased vehicles for which Mr. Nale provided the funds, the ELL Fleet included a total of 45 exotic vehicles by the end of September 2023.

22.     More specifically, in total, ELL (either directly or through Mr. Nale personally or another one of his entities) wired $10,630,478 to 7th Gear from June 14, 2022 through September 27, 2023 for the purchase of vehicles.  A complete list of the original ELL Fleet vehicles is provided in a summary included here as **Exhibit L**.

23.     The funds were wired from accounts at Huntington National Bank to 7th Gear's accounts.  The wire transfer request forms typically stated the "Purpose for the Wire" and/or the "Special Instructions from OBI" were for the purchase of specific vehicles, identified by make/model and/or VIN.  Over 40 wires were received by 7th Gear in this manner, and the following are a sample:

A.  Wire transfer request form (redacted) attached hereto as **Exhibit B** shows the wire of $302,000 from ELL to 7th Gear on February 13, 2023 for the "Purchase" of a "Green Lambo Urus Wide Body LA15330."  The alphanumeric description corresponds with the ending characters of the vehicle's VIN.

B.  Wire transfer request form (redacted) attached hereto as **Exhibit C** shows the wire of $330,000 to 7th Gear on February 16, 2023 for the "Vehicle Purchase" of a "22 Rolls Royce Ghost - 209519."  Again, the numeric description corresponds with the ending characters of the vehicle's VIN.

C.  Wire transfer request form (redacted) attached hereto as **Exhibit D** shows the wire of $235,283.50 to 7th Gear on August 11, 2022 for the "Car Purchase" of a "Ferrari 488 - 213997."  Again, the numeric description corresponds with the ending characters of the vehicle's VIN.

24.     ELL has evidence for the wiring of all of the funds, including wire transfer request forms with the vehicle information consistent with the examples above for many of them.

25.     In 2022, Mr. Cook introduced Mr. Nale to Person A.  Person A represented himself as a seller and broker of high-end supercars and exotic vehicles.

26.     Unbeknownst to Mr. Nale and ELL, Person A had a long running and well-established history of title fraud in Ohio.

27.     In 2018, the Ohio Attorney General ("OAG") identified Person A, along with his used car dealership, as defrauding customers out of valid title to purchased vehicles and, in 2020,

Person A signed an agreed consent judgment (the "Agreed Consent Judgment") admitting his part to a massive title fraud scheme strikingly similar to the one at issue here.

28.     At all times relevant to this action, Person A represented to Mr. Nale and ELL that Person A had access to, or could procure, the exotic vehicles ELL desired to include in the ELL Fleet.  Furthermore, Person A represented that he could provide these vehicles to 7th Gear for inclusion in the ELL Fleet with valid titles and with no prior liens.

29.     As such, Person A was intimately involved in the procurement and purchase of these vehicles on behalf of 7th Gear.  ELL had invested over $10 Million into the ELL Fleet, the entirety of which was under the custody and control of Mr. Cook and 7th Gear.  However, as discussed in more detail below, 7th Gear and Mr. Cook, along with Mr. Cunix, the Toy Barn, Person A and others, accepted ELL's purchase monies but did not actually purchase the vehicles as instructed by ELL, and as agreed upon by Mr. Cook and 7th Gear.

30.     Initially, and through July 2023, Mr. Cook and 7th Gear appear to have honored the 60% revenue sharing provision of the ELL Exclusive Fleet Agreement (at least in part) by providing ELL Fleet rental revenue financial reports and monies to ELL.

31.     However, in late 2023—after ELL paused providing funds to 7th Gear, Mr. Cook and 7th Gear ceased making revenue sharing payments to ELL and refused requests from Mr. Nale to sell certain vehicles in the ELL Fleet because of alleged title issues.  Mr. Nale became concerned about his investment in the ELL Fleet, and the parties entered into negotiations to amend the ELL Exclusive Fleet Agreement.

32.     As of December 2023, Mr. Cook and 7th Gear had breached the ELL Exclusive Fleet Agreement in, *inter alia*, the following ways:

> A. Failing to pay ELL its share of the gross revenues generated by the ELL Fleet, which are due on or before the 15th day of the month after the revenues were generated or, in the event of a sale or insurance casualty, on the date of said sale or casualty;

B. Failing to provide ELL with written evidence of the first position lien granted to ELL on all vehicles in the ELL Fleet;

C. Selling or otherwise transferring vehicles in the ELL Fleet without informing ELL;

D. Failing to provide data to ELL to document the operations of the ELL Fleet; and

E. Failing to provide ELL with unlimited access to the vehicle tracking software for the ELL Fleet.

***Mr. Cook and 7th Gear Propose the First Amendment to Address their Prior Breaches of the ELL Exclusive Fleet Agreement***

33.     Because Mr. Cook and 7th Gear sold ELL Fleet vehicles without ELL's consent and was not sharing revenue or reporting as agreed, Mr. Nale sought to clarify exactly which vehicles were now included in the ELL Fleet in order to ensure his investment was properly secured and protected. Accordingly, Mr. Cook and 7th Gear, with the assistance of Mr. Richardson, proposed a "new list" of vehicles that were now in the ELL Fleet, with respect to which they represented they had proper title and documentation. Mr. Nale also wanted to clarify the exact amount due to him and certainty on his first position lien on the vehicles in the ELL Fleet.

34.     Accordingly, ELL executed the First Amendment to the Exclusive Fleet Agreement with Mr. Cook and 7th Gear on or about December 28, 2023, (the "First Amendment"). A copy of the First Amendment is attached here as **Exhibit F**.

35.     The First Amendment included as Exhibit A, a table prepared by Mr. Cook, 7th Gear, and Mr. Richardson, itemizing the specific 48 exotic vehicles in the ELL Fleet by year, make, model, VIN, color and current market value (the "Asset Allocation Table"). It also clarified that Mr. Nale's investment in the ELL Fleet (including amounts owed to him for missed revenue-sharing payments) was $11,495,226. Mr. Cook and 7th Gear agreed to repay that amount and confirmed that ELL had a first position lien on all the vehicles in the ELL Fleet. Mr. Richardson persuaded Mr. Nale to not insist on being paid the amounts owed to him for missed revenue-sharing payments and instead roll those amounts into the investment for "tax reasons." Unbeknownst to Mr. Nale, a number of the

vehicles on the Asset Allocation Table had already been encumbered by various liens and most were not actually titled to 7th Gear. In fact, only a few months later, after this case was filed, 7th Gear's attorney represented to the Court that 7th Gear did not have titles to any of these cars.

36. After the First Amendment, Mr. Cook and 7th Gear continued their wrongdoing, failing to deliver evidence of ELL's first lien position and retaining 100% of the revenue generated by the ELL Fleet – which wrongdoing continues to this day. 7th Gear continues to rent out vehicles in the ELL Fleet to the public (some of which are still advertised on rent on 7th Gear's website) and refuses to provide an accounting of the revenue generated or to share any portion of said revenue.

37. According to reports provided to ELL by Mr. Cook and 7th Gear, the ELL Fleet generated at least $496,035 in gross revenue in December 2023, at least $545,994 in gross revenue in February 2024, and at least $544,170 in gross revenue in March 2024. True and accurate copies of said reports are attached hereto as **Exhibit G1** to **Exhibit G3**.

38. As a result, ELL was due over $840,000 in revenue sharing (60% of December's gross revenue and 50% of February and March's gross revenue) for those three months alone.

39. However, the parties continued to disagree about various other terms, including Mr. Cook and 7th Gear's complaints about ELL's share of the revenue, and the parties entered into negotiations for a second amendment to the ELL Exclusive Fleet Agreement.

### *ELL Executes the Second Amendment to the ELL Exclusive Fleet Agreement with Mr. Cook and 7th Gear*

40. Complaining that the revenue sharing agreed to was not fair to them, Mr. Cook and 7th Gear sought to reduce ELL's revenue sharing percentage from 60% to 50% and sought to be released from certain restrictions of the exclusivity provisions.

41. Accordingly, ELL executed the Second Amendment to the Exclusive Fleet Agreement with Mr. Cook and 7th Gear on or about January 23, 2024, (the "Second Amendment"). A copy of the Second Amendment is attached here as **Exhibit H**.

42.    In spite of this, 7th Gear and Mr. Cook continued to refuse to pay ELL the amounts due under the Agreement, which refusal continues to the present.

43.    Prior to the execution of the First Amendment, Mr. Cook and 7th Gear paid ELL at least some portion of the revenue sharing due to ELL under the ELL Exclusive Fleet Agreement.

44.    After the execution of the First Amendment, Mr. Cook and 7th Gear have failed and refused to pay *any* of the $11,495,226 they agreed was due to ELL, or *any* of the revenue sharing due to ELL.

45.    In an effort to recoup his losses, ELL received $670,000 in funds directly from Person A for sales of certain vehicles from January through March 2024.  This was with full knowledge of Mr. Cook and 7th Gear and in exercise of ELL's rights under Section 5 of the ELL Exclusive Fleet Agreement to cause the sale of vehicles in the ELL Fleet.

### *April 29, 2024 Demand Letter*

46.    From January through April 2024, ELL made several attempts to get documentation on the ELL Fleet vehicles and receive revenue payments to no avail.

47.    On April 29, 2024, through counsel, ELL provided to Mr. Cook and 7th Gear a demand letter detailing the various defaults under the agreements in an effort resolve the dispute.  A copy of the April 29, 2024 demand letter is attached here as **Exhibit I**.

48.    7th Gear refused to provide any information or payments in response to the demand letter.

49.    Aside from an initial few, Mr. Cook and 7th Gear have refused to provide the titles to the vehicles in the ELL Fleet, or evidence of ELL's first-position liens on said titles.

50.    As recent as late April, Mr. Cook affirmed to Mr. Nale that the funds that were owed were to be paid soon, at least in part, through funds to be obtained from a line of credit being obtained by Mr. Cook and Mr. Cook, Sr. through OUCU Financial.

### *Subsequent Investigation and Discovery of Fraudulent Scheme:*
### *ELL Fleet Vehicles are Sold (or Never Purchased), Marketed for Sale and Rental Revenue is not Shared*

51.     ELL has recently discovered that all Defendants and other co-conspirators coordinated their efforts and participated in a far-reaching conspiracy in the following ways:

### *7th Gear and Mr. Cook Provide Titles of ELL Fleet Vehicles to Plaintiff Only to Later Fraudulently Transfer Title to Others*

52.     Pursuant to and generally consistent with the ELL Exclusive Fleet Agreement, Mr. Cook personally provided Mr. Nale (through his attorney) with physical possession of the original titles to numerous vehicles in the ELL Fleet.  A copy of these titles is attached here as **Exhibit J**. On or about February 8, 2023, Mr. Cook personally delivered titles to the following eight vehicles:

A.  2021 Lamborghini Urus with VIN ending in [5054], which is further detailed in Overt Act G below;

B.  2022 Mercedes Benz GLS 600 with VIN ending in [5267], which is further detailed in Overt Act I below;

C.  2017 Lamborghini Huracan with VIN ending in [8154], which is further detailed in Overt Act C below;

D.  2015 Bentley Continental with VIN ending in [2683], which is further detailed in Overt Act B below;

E.  2021 Lamborghini Huracan with VIN ending in [3183], which is further detailed in Overt Act E below;

F.  2018 McLaren 570S with VIN ending in [5465], which is further detailed in Overt Act Q below;

G.  2018 Rolls-Royce Wraith with VIN ending in [7016], which is further detailed in Overt Act P below;

H.  2016 Lamborghini Huracan with VIN ending in [5158], which is further detailed in Overt Act A below.

53.     An examination of the title histories of these vehicles indicates that no sooner did Mr. Cook provide Mr. Nale with the original titles, Mr. Cook then authorized Person C to file lost title

affidavits with the Ohio Bureau of Motor Vehicles and obtained replacement titles for many of these vehicles.

54.     In each case, Person C, and employee of 7th Gear, completed and executed a sworn affidavit before a Notary Public stating that the certificate of title for each of these vehicles was lost, all the while knowing that such title was in the possession of Mr. Nale.  A sample of these lost title affidavits is included here as **Exhibit K**

55.     Pursuant to Ohio law and in reliance upon the sworn affidavits, the Ohio Bureau of Motor Vehicles complied by provided replacement or duplicate titles for these vehicles.

56.     With replacement or duplicate titles in hand, the Defendants and other co-conspirators coordinated their efforts and transferred the title to these vehicles numerous times between numerous related entities in an effort to defraud various lenders, obtain favorable loan financing, and, in several cases, to sell the same vehicles a second time to an unsuspecting retail buyer.

### _Mr. Cunix, the Toy Barn, Mr. Cook and 7th Gear Conspired Together to Defraud ELL and Share the Proceeds of the Conspiracy_

57.     The ELL Exclusive Fleet Agreement contemplates that Mr. Nale, through ELL or a predecessor entity, would provide the full cash purchase price for any given exotic vehicle.  As described herein, ELL provided the full cash purchase price for each vehicle described in **Exhibit L**.

58.     The ELL Exclusive Fleet Agreement also contemplates that 7th Gear will purchase each exotic vehicle using monies provided by Mr. Nale, ELL, or a predecessor entity.   On information and belief, a substantial portion of the exotic vehicles were to be procured or purchased from Mr. Cunix and the Toy Barn.

59.     An examination of bank transfers and monies exchanged between Mr. Cunix and his entities (the Toy Barn and Cunix Automotive Group) ("Cunix and his Entities") and Mr. Cook and

his entities (7th Gear) for the period of time beginning June 14, 2022 and November 13, 2023 indicates that 7th Gear never paid the full purchase price for any exotic vehicle. Instead, monies exchanged between Cunix and his Entities and 7th Gear appear in a haphazard manner with no discernable business purpose other than to defraud Plaintiff and others and share the proceeds of their ill-gotten gain.

60.     At the end of this time period, Cunix and his Entities end up with over $1.5 million of Mr. Nale and ELL's monies and, as described herein, the Toy Barn recovered title to a substantial portion of the ELL Fleet vehicles through fraudulent means and false affidavits. As detailed in the associated Overt Acts, the Toy Barn then proceeded to sell these exotics again to traditional retail buyers and retained the proceeds of the sale—clearing millions of dollars in the process.

### *Mr. Sulejmani and ES Exotics Conspired with Mr. Cook and 7th Gear to Defraud and Deprive ELL of its Property and Rights*

61.     Mr. Sulejmani is Mr. Cook's oldest friend and closest advisor.

62.     Mr. Sulejmani either directly and/or through ES Exotics participated directly in the operations and decision-making process for 7th Gear.

63.     Mr. Sulejmani and ES Exotics conspired with 7th Gear to deprive ELL of its right to be the exclusive provider of funds to purchase vehicles for 7th Gear. ELL Exclusive Fleet Agreement, Section 6.

64.     In contravention to the exclusivity provisions of the ELL Exclusive Fleet Agreement, Mr. Sulejmani and ES Exotics provided one or more vehicles to 7th Gear for rental to the general public.

65.     When this scheme was uncovered by ELL, Defendants agreed that ELL could **purchase** one of the offending automobiles, a 2022 Corvette, from Mr. Sulejmani and ES Exotics, and put it in the ELL Fleet.

66.     On or about June 30, 2023, ELL wired $100,000 to ES Exotics for purchase of the 2022 Corvette.

67.     Mr. Sulejmani and ES Exotics refused to deliver the title to the vehicle to ELL, or to put the vehicle in the ELL Fleet.

68.     To this day, Defendants have failed to deliver the title to the vehicle to 7th Gear and secure a first position lien notation to ELL, to put the vehicle in the ELL Fleet, or to deliver the vehicle to ELL.

*__Person A Conspired with Mr. Cook and 7th Gear to Defraud and Deprive ELL of its Property and Rights__*

69.     Person A knew that ELL was providing 100% of the purchase price of the vehicles in the ELL Fleet to 7th Gear, and conspired with 7th Gear and Mr. Cook to perpetrate this massive fraudulent scheme against ELL.

70.     Person A knew that ELL had provided at least $9 million to 7th Gear to purchase vehicles.

71.     For example, on April 16, 2024, in an effort to further advance and conceal the fraud against ELL, Mr. Cook sent an email to Person A, copying Mr. Nale, and stating as follows:

> Due to the past due balance due to 7GE from months of short-term lease deals, and that 7GE has not been able to obtain titles to certain cars purchased over the past year(s), [Person A] has suggested we purchase new inventory that is equal to the purchase price of certain vehicles we have had trouble obtaining title to referenced below as "return vehicles". [Person A] has been sending new inventory to 7GE listed below "hold vehicles".

72.     This email was nothing more than an attempt to further defraud ELL, as both Person A and Mr. Cook knew that one of the reasons Person A was unable to obtain titles for 7th Gear was that the full purchase price of the vehicles was being diverted for other uses.

73.     The email further stated, "Both parties [Person A and 7th Gear] have agreed to accept the original purchase price as available credit on new inventory."

74.     But, "both parties" knew that the original purchase price – which was provided in full by ELL – was fraudulently diverted by Defendants for other uses.

75.     Mr. Nale, however, did not know the truth, and this email was just one example of Person A and Mr. Cook and 7th Gear working together to advance and extend their scheme to defraud Mr. Nale.

76.     Person A did not respond and explain to Mr. Cook that of course no titles were provided because the funds provided by ELL were diverted by Defendants for other uses.

77.     Person A did not reach out to Mr. Nale and tell the truth.

78.     Person A was participating in the fraud.

79.     Just like the substitution of vehicles accomplished by the First Amendment, this was another "swap out" of vehicles to avoid revealing the vast fraud engaged in by Defendants.

80.     On or about February 16, 2024, Person A represented to Mr. Nale in an electronic message that titles to the following vehicles were "ready to transfer":

     A.  2022 Maserati MC20 - 214414

     B.  2022 McLaren GT - 001903

     C.  2022 Lamborghini Urus - A18272

     D.  2022 Rolls-Royce Cullinan - 214414

     E.  2021 Mercedes-Benz GLS600 - 401983

81.     In the same February 16, 2024 message, Person A represented to Mr. Nale that titles to the following vehicles were "pending within a few days to [a] few weeks":

     A.  2022 Ferrari 812 Superfast - 239674

     B.  2021 Ferrari Roma - 268704

C.  2021 Rolls-Royce Cullinan - 204623

D.  2021 Lamborghini Huracan Spyder - A16205

E.  2022 Cadillac Escalade - 255049

F.  2022 Cadillac Escalade - 166447

82.     All of these vehicles appear to correspond to vehicles in the ELL Fleet per the Asset Allocation Table based on their descriptions and last few digits of the VINs.

83.     But, neither ELL nor Mr. Nale has been provided with evidence of his liens on these titles, and has been prevented from exercising his right to sell these vehicles and receive the proceeds.

84.     Person A also participated with Mr. Cook and 7th Gear in defrauding ELL through "short term" leases that he allegedly arranged with third parties, and requested ELL through 7th Gear to fund the purchase of vehicles to so lease.

85.     Like the rest of the vehicles, these vehicles were not actually purchased by 7th Gear with clean titles, if at all.

86.     Further, Person A did not pay to ELL or 7th Gear the rental proceeds from these vehicles.

87.     Person A received a "spiff" in the amount of several thousand dollars for each vehicle allegedly purchased by 7th Gear with funds provided by ELL, giving him a clear financial incentive to close these "sales" whether they were legitimate or fraudulent.

88.     Defendants acted illegally and with reckless disregard to ELL's rights, interests, and well-being.  Defendants' conduct threatens the future of ELL and its business.  Unless injunctive relief is granted, ELL will suffer irreparably injury and be unable to operate its business and meet its obligations, resulting in damage to its business and reputation that are impossible to measure at this time as well as permanently damaging it.

89.     Furthermore, Defendants actions and attempts to sell the already moveable vehicles and convert them into cash in violation of the applicable agreement threatens Plaintiff with irreparable injury, especially given the unique and exotic nature of the vehicles.

90.     Now, ELL seeks enforcement of its agreement with Mr. Cook and 7th Gear, recovery of his property and funds, injunctive relief and any and all other relief and damages resulting from Defendants' egregious and wrongful actions.

### *Mr. Richardson's Participation in Perpetuating the Fraud and Realizing a Windfall*

91.     Mr. Richardson became associated with 7th Gear in the summer of 2023 and provided business coaching services to Mr. Cook and Mr. Nale.  In this role, Mr. Richardson became intimately familiar with 7th Gear operations and the underlying fraud perpetuated by Mr. Cook.  Mr. Richardson understood that, in spite of the ELL Exclusive Fleet Agreement, 7th Gear did not have title to any of the vehicles in its operations.

92.     At critical moments while Mr. Nale and ELL were investing monies with 7th Gear, Mr. Richardson provided support and encouragement to Mr. Nale to continue doing business with 7th Gear.

93.     One such moment was when Mr. Nale and ELL became legitimately concerned about the substantial monies it had invested with 7th Gear, only to learn the 7th Gear could not produce titles to any of the vehicles it represented as having purchased.  As detailed above, Mr. Cook and 7th Gear sold ELL Fleet vehicles without ELL's consent, never actually purchased many of the vehicles, and was not sharing revenue or reporting as agreed.  Mr. Nale sought to clarify exactly which vehicles were now included in the ELL Fleet.  To alleviate Mr. Nale and ELL's concerns, Mr. Cook and 7th Gear proposed a "new list" of vehicles that were now in the ELL Fleet, with respect to which they represented they had proper title and documentation.  This "new list" of vehicles is included with **Exhibit F** as an attachment known as the Nate Nale Asset Allocation Table.

- 19 -

94. The Nate Nale Asset Allocation Table was prepared by Mr. Richardson in a lengthy meeting he had with Mr. Cook. Mr. Richardson knew, at the time he drafted and prepared the Nate Nale Asset Allocation Table, that it was not accurate and that 7th Gear did not, in fact, hold title to the various vehicles listed in the document.

95. In spite of this, Mr. Richardson completed the Nate Nale Asset Allocation Table, and together with Mr. Cook, Mr. Richardson personally met with Mr. Nale at a lunch meeting to present and discuss the "new list" of vehicles. Mr. Richardson represented the accuracy and veracity of the Nate Nale Asset Allocation Table to be true and encouraged Mr. Nale to execute the First Amendment as detailed above. At the same time, Mr. Richardson also persuaded Mr. Nale to not insist on being paid the amounts owed to him for missed revenue-sharing payments and instead roll those amounts into the investment for "tax reasons." Based, in part, on these assurances, Mr. Nale executed the First Amendment.

96. Additionally, ELL paid Mr. Richardson $134,953.14 from June 2023 to November 2023, which was based on a percentage of revenue generated by the ELL Fleet, which ELL was never paid and which we now know was fraudulent.

97. Instead of providing advice and counsel to Mr. Nale and ELL, Mr. Richardson participated in the conspiracy to defraud along with other Defendants, and benefitted from the fruits of said fraud through payments from 7th Gear that were funded by funds obtained through the fraudulent scheme and conspiracy detailed herein, and through other benefits, including 7th Gear paying for Mr. Richardson's personal vacation and other expenses.

### *Mr. Cook Sr. Transfers an Exotic Vehicle to Himself and Later Sells it for a Windfall*

98. As detailed in Overt Act CC below, on or about May 2, 2023, ELL wired $258,500.00 to 7th Gear for the purchase of a 2021 Lamborghini Urus with a VIN ending in [3544]. On or about

May 9, 2023, the Toy Barn transferred this vehicle to itself for resale to 7th Gear pursuant to this arrangement.

99. However, instead of transferring this vehicle to 7th Gear as contemplated by the ELL Exclusive Fleet Agreement, the Toy Barn, working in coordination with 7th Gear, transferred ownership of this vehicle to Mr. Cook's father, Mr. Cook Sr. (i.e. Tiff Joseph Franklin Cook). The title evidencing this fraudulent transfer is attached here as **Exhibit M**.

100. Presumably, Mr. Cook Sr. enjoyed the use of this vehicle and eventually sold it to an unknown Florida retail buyer on or about January 22, 2024, and in doing so, realized a windfall on the sale of a vehicle that was, per the ELL Exclusive Fleet Agreement, purchased with funds provided by ELL and subject to a lien to ELL.

### *T Cook Holdings LLC*

101. On information and belief, since the filing of this action and in an effort to evade a proper accounting of its assets, Mr. Cook has transferred 7th Gear assets to a previously-formed entity, T Cook Holding LLC, an Ohio limited liability company.

### COUNT ONE
### 18 U.S.C. § 1962(c) and (d) Civil RICO (Racketeer Influenced Corrupt Organizations) Against All Defendants

102. Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

### *The Enterprise*

103. The Defendants, the Toy Barn, Mr. Cunix, 7th Gear, Mr. Cook, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani, together with Person A, Person B, and Person C and others, were members of an organization loosely affiliated with the Defendants, Person A, Person B, and Person C and others (the "Enterprise"), whose members and associates engaged in transportation of stolen vehicles, sale or receipt of stolen vehicles, wire fraud, money laundering,

motor vehicle title fraud, theft, telecommunications fraud, tampering with records, receiving stolen property and other crimes within the Southern District of Ohio and elsewhere.

104.    Defendants are individuals and/or entities capable of holding a legal or beneficial interest in property, within the meaning of "person" as that term is defined in 18 U.S.C. § 1961(3).

105.    The Enterprise, including its members and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), insofar as they are legal entities and a group of individuals associated in fact.

### *Purposes of the Enterprise*

The purposes of the enterprise included, but were not limited to, the following:

106.    Promoting, protecting, and enhancing the reputation and standing of the Enterprise as a group of successful businesses and individuals in the exclusive exotic vehicles leasing business.

107.    Enriching its members and associates through, among other things, the fraudulent solicitation of investments in the financing of exotic vehicles and the commission of crimes including the transportation of stolen vehicles, sale or receipt of stolen vehicles, wire fraud, money laundering, motor vehicle title fraud, theft, telecommunications fraud, tampering with records, receiving stolen property and other crimes.

108.    Creating false and fraudulent financial statements and reports to perpetuate the continued existence of the enterprise.

109.    Preparing false and fraudulent vehicle offering material intended to entice business investments for the financing of exotic vehicles including, without limitation, the list of vehicles attached as Ex. A to the ELL Exclusive Fleet Agreement.

110.    Protecting the enterprise, including its members and associates, from detection, apprehension, and prosecution by law enforcement authorities.

### *Means and Methods of the Enterprise*

111.     The multiple Defendants conspired together to defraud Plaintiff out his multimillion-dollar investment through a coordinated effort of fabricated documents, false promises, and fraudulent titles and then laundered the proceeds of their fraud through financial institutions insured by the FDIC.  Using extensive communications through text, email, social media messaging apps, or other electronic methods, Defendants carried on this conspiracy for over two years, which conspiracy is still continuing at this time.

112.     Unbeknownst to Plaintiff, one of the Defendants has a long running and well-established history of title fraud in Ohio, selling or brokering vehicles that he knew he did not have valid title to—accepting the full purchase price and yet failing to deliver titles.  Instead of purchasing vehicles with over $10 million invested by Plaintiff, granting the titles and liens, and paying the revenue share as expressly agreed, Defendants simply financed or otherwise secured cars, without titles, represented them as being purchased, and then disposed of them without even notifying Plaintiff.

113.     Mr. Cunix and the Toy Barn participated in the enterprise by, among other things: devising and participating in a scheme with Person A, Person B, and Defendants, Mr. Cook, 7th Gear, ES Exotics and Mr. Sulejmani, designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cunix's own company or to himself personally, Person A, and to Mr. Sulejmani's own company or to himself personally.  Mr. Cunix further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; repeatedly diverting monies provided by Plaintiff for the purchase of exotic vehicles for his personal gain;

requiring payments in cash (derived from funds provided by or due to Plaintiff) in exchange for his participating in, furthering, and concealing this conspiracy; and creating and causing to be created false titles, texts, and vehicle purchase contracts to further the scheme.

114.    Mr. Cook and 7th Gear participated in the enterprise by, among other things: devising and participating in a scheme with Person A, Person B, and Person C, and Defendants, the Toy Barn, Mr. Cunix, ES Exotics and Mr. Sulejmani, designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally, Person A, and to Mr. Sulejmani's own company or to himself personally.  Mr. Cook further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; repeatedly diverting monies provided by Plaintiff for the purchase of exotic vehicles and from the revenue generated by said vehicles for his personal gain; making payments in cash (derived from funds provided by or due to Plaintiff) to Mr. Cunix to further and conceal this conspiracy; and creating and causing to be created false financial reports, emails, contracts, and subcontracts to further the scheme.

115.    Mr. Richardson participated in the enterprise by, among other things: devising and participating in a scheme with Person A, Person B, and Person C, and Defendants, the Toy Barn, Mr. Cunix, ES Exotics and Mr. Sulejmani, designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally, Person A, and to Mr. Sulejmani's own company or to himself personally.  Mr. Cook further participated in the enterprise by: actively concealing and failing to disclose that monies

provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; repeatedly diverting monies provided by Plaintiff for the purchase of exotic vehicles and from the revenue generated by said vehicles for his personal gain; and creating and causing to be created false financial reports, emails, contracts, and subcontracts to further the scheme.

116.    Mr. Cook, Sr. participated in the enterprise by, among other things: devising and participating in a scheme with Person A, Person B, and Person C, and Defendants, the Toy Barn, Mr. Cunix, ES Exotics and Mr. Sulejmani, designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally, Person A, and to Mr. Sulejmani's own company or to himself personally.  Mr. Cook, Sr. further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; repeatedly diverting monies provided by Plaintiff for the purchase of exotic vehicles and from the revenue generated by said vehicles for his personal gain; and creating and causing to be created false financial reports, emails, contracts, and subcontracts to further the scheme.

117.    Person A participated in the enterprise by, among other things: devising and participating in a scheme with Defendants Mr. Cook and 7th Gear designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally and Person A.  Person A further participated in the

enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase exotic vehicles as was required by the ELL Exclusive Fleet Agreement and by Person A's representations to ELL; actively concealing and failing to disclose that exotic vehicles to be purchased with Plaintiff's funds were encumbered by preexisting liens; actively concealing and failing to disclose that 7th Gear did not own clear title to the exotic vehicles financed by Plaintiff; either participating in or concealing the diversion of monies provided by Plaintiff for the purchase of exotic vehicles and from the revenue generated by said vehicles; and creating and causing to be created false communications to further the scheme.

118.     Mr. Sulejmani and ES Exotics participated in the enterprise by, among other things: devising and participating in a scheme with Defendants 7th Gear and Mr. Cook designed to defraud Plaintiff out of funds through a series of false transactions resulting in Plaintiff's monies being transferred to Mr. Cook's own company or to himself personally and to Mr. Sulejmani's own company or to himself personally.  Mr. Sulejmani further participated in the enterprise by: actively concealing and failing to disclose that monies provided by Plaintiff did not fully purchase one or more exotic vehicles as was required by the ELL Exclusive Fleet Agreement; failing to transfer title to one or more of the exotic vehicles purchased with funds provided by Plaintiff; diverting monies provided by Plaintiff for the purchase of exotic vehicles for his personal gain; creating and causing to be created false communications to further the scheme.

119.     Additionally, Enterprise members participated in the production of promotional videos boasting of the success of the members of the Enterprise using vehicles ostensibly purchased with Plaintiff's monies.  These videos were posted on various social networking sites utilized by members of the Enterprise.

120.     Enterprise members created false and fraudulent financial statements and reports to further conceal their fraudulent activity.

121.    Enterprise members created false affidavits representing ELL Fleet vehicle titles to be lost to further conceal their fraudulent activity.

### *The Racketeering Conspiracy*

122.    Beginning on or about January 1, 2022, and continuing thereafter up to and including the date of this Verified Complaint, in the Southern District and elsewhere, Defendants, the Toy Barn, Mr. Cunix, 7th Gear, Mr. Cook, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani, together with Person A, Person B, and Person C, and other unknown individuals, being persons employed by and associated with the Enterprise engaged in and participated in activities which affected, interstate and foreign commerce, unlawfully, knowingly, and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(5), consisting of multiple acts which are indictable under the following statutes:

A.    18 U.S.C. § 2312 (transportation of stolen vehicles);

B.    18 U.S.C. § 2313 (sale or receipt of stolen vehicles);

C.    18 U.S.C. § 1343 (wire fraud);

D.    18 U.S.C. § 1956 (money laundering);

E.    18 U.S.C. § 1962(d) (conspiracy to commit any of the above);

F.    Multiple acts of motor vehicle title fraud chargeable under R.C. § 4505.06(A)(5)(b) and R.C. § 4505.181(B)(1);

G.    Multiple acts of theft chargeable under R.C. § 2913.02;

H.    Multiple acts of telecommunications fraud chargeable under R.C. § 2913.05;

I.    Multiple acts of tampering with records chargeable under R.C. § 2913.42;

J.    Multiple acts of receiving stolen property chargeable under R.C. § 2913.02;

K. Conspiracy to commit any of the foregoing state crimes chargeable under R.C. § 2923.01; and

L. Complicity to commit any of the foregoing state crimes chargeable under R.C. § 2923.03.

123. It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

*Overt Acts*

124. In furtherance of the conspiracy, and in order to affect the object thereof, Defendants and their co-conspirators committed and caused to be committed the following over acts, among others, in the Southern District of Ohio and elsewhere:

A. On or about June 14, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $255,290.00 for the purchase of a Lamborghini with a VIN ending in A05158. Through a complex series of title transfers in a further attempt to defraud, Defendants and their co-conspirators laundered the title to this vehicle and on or about November 16, 2023, the **Toy Barn** and **Mr. Cunix** sold it to a retail buyer for $204,000.00. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit N**.

B. On or about June 14, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing

$99,970.00 for the purchase of a Bentley Continental GT with a VIN ending in 042683.

C. On or about June 24, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $252,750.00 for the purchase of a Lamborghini with a VIN ending in A08154. Through a complex series of title transfers in a further attempt to defraud, Defendants and their co-conspirators laundered the title to this vehicle and on or about January 12, 2023, 7th Gear transferred ownership of it back to the **Toy Barn** and **Mr. Cunix**, who, on information and belief, currently retains title. The title evidencing that transfer and a summary of the ownership history of this vehicle is included as **Exhibit O**.

D. On or about August 1, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $289,500.00 for the purchase of a Lamborghini URUS with a VIN ending in A13778.

E. On or about August 1, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $250,000.00 for the purchase of a Lamborghini with a VIN ending in A03183.

Through a complex series of title transfers in a further attempt to defraud, Defendants and their co-conspirators laundered the title to this vehicle and on or about March 25, 2024, the **Toy Barn** and **Mr. Cunix** sold it to a retail buyer for $202,200.00. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit P**.

F. On or about August 11, 2022, knowingly and with intent to defraud, Defendants **Tiff A. Cook** and **7th Gear** entered into the Exclusive Fleet Agreement intending to induce Nathaniel Nale and his anticipated newly formed entity of Plaintiff, Exotic Leasing, LLC into further investments of monies ostensibly for the financing of exotic vehicles.

G. On or about August 11, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nathaniel Nale, on behalf of the anticipated newly formed entity of Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $298,784.00 for the purchase of a Lamborghini with a VIN ending in A15054.

H. On or about August 11, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nathaniel Nale, on behalf of the anticipated newly formed entity of Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $235,284.00 for the purchase of a Ferrari 488 with a VIN ending in 213997. Ownership of this vehicle never passed through 7th Gear's hands. On or about November 14, 2022, Oxford Motors, LLC (an entity affiliated with Person A) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on information and belief, currently


retains title. The title evidencing that transfer and a summary of the ownership history of this vehicle is included as **Exhibit H**.

I.   On or about August 22, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $250,000.00 for the purchase of a Mercedes-Maybach GLS 600 with a VIN ending in A03183.

J.   On or about September 2, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $260,000.00 for the purchase of a Lamborghini with a VIN ending in A14466.

K.   On or about September 13, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $279,000.00 for the purchase of a Lamborghini with a VIN ending in LA15330.

L.   On or about September 13, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nale Business Group, LLC, an entity wholly owned by Nathaniel Nale and a predecessor entity to Plaintiff, Exotic Leasing LLC, into entering into a business relationship with

7th Gear and investing $260,000.00 for the purchase of a Rolls Royce Dawn with a VIN ending in U11574.

M. On or about September 23, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $115,000.00 for the purchase of a Cadillac Escalade with a VIN ending in R269933.

N. On or about September 23, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $96,000.00 for the purchase of a Cadillac Escalade.

O. On or about October 13, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Nathaniel Nale, on behalf of Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $303,000.00 for the purchase of a McClaren 720s with a VIN ending in 005067.

P. On or about November 3, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $453,000.00 for the purchase of two exotic vehicles, a Rolls Royce Wraith and a Bentley Bentayga with a VIN ending in 035362.

Q. On or about November 15, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and

investing $170,250.00 for the purchase of a McLaren 570s with a VIN ending in 005465. Through a complex series of title transfers in a further attempt to defraud, Defendants and their co-conspirators laundered the title to this vehicle and on or about February 19, 2024, the **Toy Barn** and **Mr. Cunix** sold it to a retail buyer for $152,746.00. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit R**.

R. On or about December 8, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $272,500.00 for the purchase of a Lamborghini Huracan Evo with a VIN ending in A16205.

S. On or about December 22, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $270,000.00 for the purchase of a Lamborghini Wide Body URUS with a VIN ending in 1307079.

T. On or about December 22, 2022, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $127,500.00 for the purchase of a Porsche Targa.

U. On or about January 30, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $300,500.00 for the purchase of a Lamborghini Aventador S with a VIN ending

in A07642.  Ownership of this vehicle never passed through 7th Gear's hands. On or about June 12, 2023, Zadart LLC (an entity unaffiliated with Defendants) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on June 10, 2024, sold it to a retail buyer for $207,500.00.  The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit S**.

V.  On or about February 13, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $302,000.00 for the purchase of a Lamborghini Wide Body URUS with a VIN ending in LA15330.  Instead of purchasing it pursuant to the ELL Exclusive Fleet Agreement, Defendants and their co-conspirators arrange for the purchase of this vehicle six months later from Carrio Motor Cars (an unaffiliated entity).  Ownership of this vehicle never passed through 7th Gear's hands.  On or about August 3, 2023, Carrio Motor Cars transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on information and belief, currently retains title.  The title evidencing that transfer and a summary of the ownership history of this vehicle is included as **Exhibit T**.

W.  On or about February 16, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $330,000.00 for the purchase of a Rolls Royce Ghost with a VIN ending in 209519.

X.  On or about February 16, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic

Leasing LLC, into entering into a business relationship with 7th Gear and investing $170,000.00 for the purchase of a Mercedes-Maybach GLS 600 with a VIN ending in 401983.

Y. On or about February 23, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $105,000.00, $96,500.00, and $93,500.00 for the purchase of three Cadillac Escalades, two of which have the following VINs ending in 115436, and 166447.

Z. On or about March 1, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $663,000.00 for the purchase of three Cadillac Escalades with VINs ending in 225049, 275298, and 255426, and the purchase of a Rolls Royce Cullinan.

AA. On or about March 31, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $258,500.00 for the purchase of a Corvette with a VIN ending in 125222, and the purchase of a McLaren 570s with a VIN ending in 008647. Through a complex series of title transfers in a further attempt to defraud, Defendants and their co-conspirators laundered the title to both of these vehicles and on or about July 28, 2023 and on or about August 1, 2023, 7th Gear transferred ownership of these vehicles back to the **Toy Barn** and **Mr. Cunix**, who, on information and belief, currently retains title to both. The titles

evidencing those transfers and a summary of the ownership history of these vehicles is included as **Exhibit U**.

BB.    On or about April 19, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $163,250.00 for the purchase of a McLaren Spyder with a VIN ending in 004490.  Ownership of this vehicle never passed through 7th Gear's hands.  On or about April 18, 2023, Cars and Land LLC (an entity unaffiliated with Defendants) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on May 24, 2023, sold it to a retail buyer for $186,550.00.  The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit V**.

CC.    On or about May 2, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $258,500.00 for the purchase of a Lamborghini URUS with a VIN ending in A13544.  Ownership of this vehicle never passed through 7th Gear's hands.  On or about May 9, 2023, Montis Auto Center (an entity unaffiliated with Defendants) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on July 6, 2023, sold it to **Mr. Cook Sr.** for $266,000.00.  Financing for this vehicle was provided in coordination with **Mr. Cook Sr.**, **Tiff A. Cook**, **7th Gear**, **Toy Barn** and **Mr. Cunix**.  The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit W**.

DD. On or about May 10, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $621,400.00 for the purchase of two Lamborghini URUSs with a VINs ending in A18272 and A12246, and a Corvette. Ownership of the Lamborghini URUS with a VIN ending in A12246 never passed through 7th Gear's hands. On or about May 10, 2023, Ryan Auto Sales (an entity unaffiliated with Defendants) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on December 16, 2023, sold it to a retail buyer for $227,905.00. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit X**.

EE. On or about May 18, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $300,000.00 for the purchase of an unknown vehicle for 7th Gear to retain as a vehicle for the benefit of **Mr. Richardson**, who used this vehicle as his personal vehicle.

FF. On or about June 13, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $179,000.00 for the purchase of a Corvette Z06 with a VIN ending in 601818.

GG. On or about June 21, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing

$394,000.00 for the purchase of a Rolls Royce Ghost with a VIN ending in 209177.

HH.    On or about June 27, 2023, knowingly and with intent to defraud, Defendant, **Tiff A. Cook** and **7th Gear**, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $500,000.00 for the financing of 7th Gear's wholesale floor plan for additional vehicle purchases.

II. On or about June 30, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $392,500.00 for the purchase of a Rolls Royce Phantom with a VIN ending in 104562, and the purchase of a Rolls Royce Wraith with a VIN ending in X85509.

JJ. On or about June 30, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook, Ergi Sulijmani,** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $100,000.00 for the purchase of a Corvette. Ownership of this vehicle never passed through 7th Gear's hands. On or about July 1, 2023, Mr. Sulejmani transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on October 27, 2023, sold it to a retail buyer for $89,000.00. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit Y**.

KK.    On or about July 20, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $298,000.00 for the purchase of a Rolls Royce Phantom with a VIN ending in 104623. Ownership of this vehicle never passed through 7th Gear's hands. On

or about September 5, 2023, Elite Motor Cars of Miami, LLC (an entity unaffiliated with Defendants) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on January 3, 2024, sold it to a retail buyer for $332,753.34. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit Z**.

LL. On or about August 4, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $247,000.00 for the purchase of a Lamborghini URUS with a VIN ending in A178855. Ownership of this vehicle never passed through 7th Gear's hands. On or about May 2, 2023, Michael Robert Yeager / RP Exotics (an entity unaffiliated with Defendants) transferred ownership of it to the **Toy Barn** and **Mr. Cunix**, who, on August 3, 2023, sold it to a retail buyer for $259,900.00. The title evidencing that sale and a summary of the ownership history of this vehicle is included as **Exhibit AA**.

MM. On or about September 13, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and investing $240,000.00 for the purchase of a Maserati with a VIN ending in 403943.

NN. On or about September 27, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear,** and Person A, induced Plaintiff, Exotic Leasing LLC, into entering into a business relationship with 7th Gear and

investing $180,000.00 for the purchase of a Mercedes-Maybach with a VIN ending in A023998.

OO.    On or about December 28, 2023, knowingly and with intent to defraud, Defendants, **Tiff A. Cook**, **7th Gear**, and **Mr. Richardson**, induced Plaintiff, Exotic Leasing LLC, into entering into the First Amendment to the Exclusive Fleet Agreement making representations each knew at the time to be false in order to conceal the enterprises title fraud activities. **Mr. Richardson** worked with **Tiff A. Cook** to prepare the "Nate Nale Allocation Table" attached to the First Amendment knowing it was false.

PP. Sometime in January 2024, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, prepared and delivered to Plaintiff a financial report indicating a gross revenue figure of $496,035 from the leasing of Plaintiff's vehicles for the month of December 2023, representations he knew at the time to be false in order to conceal the enterprises title fraud activities.

QQ.    Sometime in March 2024, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, prepared and delivered to Plaintiff a financial report indicating a gross revenue figure of $545,994 from the leasing of Plaintiff's vehicles for the month of February 2024, representations he knew at the time to be false in order to conceal the enterprises title fraud activities.

RR.    Sometime in April 2024, knowingly and with intent to defraud, Defendants, **Tiff A. Cook** and **7th Gear**, prepared and delivered to Plaintiff a financial report indicating a gross revenue figure of $544,170 from the leasing of Plaintiff's vehicles for the month of March 2024, representations he knew at the time to be false in order to conceal the enterprises title fraud activities.

SS. Throughout the course of the racketeering conspiracy, Defendants **Toy Barn**, **Mr. Cunix**, **Tiff A. Cook**, **7th Gear**, **Mr. Cook Sr.**, **Mr. Richardson**, **Ergi Sulejmani**, and **ES Exotics**, and Person A and others conspired to commit, and did commit, money laundering, in that they engaged in financial transactions affecting interstate and foreign commerce, including the use of financial institutions insured by the FDIC to facilitate the movement of fraudulent proceeds between the Southern District of Ohio and other jurisdictions and elsewhere, in order to conceal the nature and source of funds and to promote the activities of the enterprise.

TT. Throughout 2023, knowingly and with intent to defraud, Defendants, **Mr. Richardson** and **Ergi Sulejmani**, assured Plaintiff regarding the security of the ELL Fleet vehicles and urged Plaintiff to continue investing monies 7th Gear.

UU.    Sometime in January 2024, **Mr. Cook Sr.** sold the ELL Fleet vehicle identified in Over Act CC to a retail buyer in Florida and realized a substantial windfall.

All of the above are in violation of 18 U.S.C § 1962(d) and were made using text, email, social media messaging apps, or other electronic methods.

125.    Defendants' scheme to defraud Plaintiff injured Plaintiff in an amount greater than $11 Million.

## COUNT TWO
## FRAUDULENT CONCEALMENT
### Against all Defendants

126.    Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

127.    As a party to the business transaction between ELL on the one side, and Defendants on the other side, Defendants had a duty to disclose to ELL, among other things, the following: that

they did not receive or furnish titles to the vehicles allegedly purchased with ELL's funds, that they were diverting ELL's funds for uses not authorized by ELL, and that they were unable to grant the liens as agreed. This information was material to ELL's business relationship with Defendants because ELL would not have entered into or continued a business relationship with Defendants with this knowledge.

128. Mr. Cook and 7th Gear, with the assistance, participation, and cooperation of the Toy Barn, Mr. Cunix, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani, intentionally concealed the above material information from ELL in order to induce ELL into entering into a business relationship with Mr. Cook and 7th Gear and investing over $10 Million for the purchase of dozens of exotic vehicles.

129. ELL justifiably relied on Mr. Cook and 7th Gear in entering into and continuing the business relationships with the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani because it had no knowledge of the private agreements between Defendants to defraud it and could not have obtained that knowledge absent Defendants' confessions.

130. As a result of the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani's concealment of material facts concerning the multiple exotic vehicle transactions, ELL suffered damages in an amount greater than $11 Million.

## COUNT THREE
## FRAUDULENT MISREPRESENTATION
### Against all Defendants

131. Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

132. Defendants, the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani made material

misrepresentations to ELL from June 2022 through May 2024, regarding the purchase of exotic vehicles with funds provided by ELL, and the revenue generated by these vehicles. At the time, the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani had an off-the-books deal with each other to receive funds or other benefits from ELL without providing vehicle titles.

133. Person A represented that he was able to provide clean titles to the vehicles represented as being purchased with ELL's funds, that vehicles were being rented through "short term" leases that he allegedly arranged with third parties, and requested ELL through 7th Gear to fund the purchase of vehicles to so lease, despite either not paying all of the rental payments received to 7th Gear or representing that leases occurred when they did not or were not paying leases.

134. The Toy Barn, Mr. Cunix, and Person B represented that the Toy Barn would provide clean titles to vehicles represented as being purchased with ELL's funds.

135. Mr. Cook made material misrepresentations to ELL by creating and sending to ELL numerous fabricated and/or wholly false financial reports detailing 7th Gears' grossly inflated vehicle rental revenue figures in order to cover up his and the other co-conspirators' scheme.

136. Mr. Richardson made material misrepresentations to ELL by assisting in creating and sending to ELL a fabricated and/or wholly false "Nate Nale Asset Allocation Table" attached to **Exhibit F** and together with Mr. Cook, persuaded ELL as to its alleged veracity in order to cover up his and the other co-conspirators' scheme.

137. Defendants made the above representations with knowledge of their falsity and/or with such utter disregard and recklessness as to whether they were true or false that such knowledge may be inferred.

138.    Defendants made representations with the intent of misleading ELL into relying upon them and continuing in the business transactions with the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani.

139.    ELL justifiably relied on the representations.

140.    ELL was directly and proximately injured as a result of their reliance on Defendants representations in an amount greater than $11 Million.

## COUNT FOUR
## CIVIL ACTION FOR CRIMINAL THEFT (R.C. §§ 2307.60, 2307.61)
## Against all Defendants

141.    Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

142.    By stealing money from ELL, Defendants, the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani have committed a theft offense under Ohio law.

143.    Defendants, with a purpose to deprive ELL of the funds, knowingly obtained and exerted control over the funds with ELL's consent and beyond the scope of the express or implied consent ELL gave Defendants, and by deception.

144.    Mr. Cook did not have ELL's permission to transfer funds to the Toy Barn or Person A under the circumstances alleged herein, in which the Toy Barn and Person A, using ELL's funds, procured exotic vehicles he knew he was unable to provided titles for.

145.    Defendants, the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani all exerted control over ELL's funds beyond the scope of the express or implied consent ELL gave them, insofar as ELL provided funds with the expectation that the funds would be used to purchase vehicles with valid titles and, with respect to revenue generated by said vehicles, to receive its proper share of said revenue.  As described herein, the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B,

Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani took steps to induce and actively conceal their scheme from ELL.

146.     As a result of Defendants' theft of the funds, ELL suffered damages in an amount greater than $11 Million.

<div align="center">

**COUNT FIVE**
**CIVIL ACTION FOR CRIMINAL ACT OF**
**TELECOMMUNICATIONS FRAUD (R.C. § 2913.05)**
**Against all Defendants**

</div>

147.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

148.     Defendants, having devised a scheme to defraud, knowingly transmitted by means of a telecommunications device a writing with the purpose to execute or otherwise further the scheme to defraud.

149.     As detailed above, Defendants, Mr. Cunix, Mr. Cook, and Mr. Sulejmani, Person A, Person B, and Person C, communicated via text message, WhatsApp, and email throughout the relevant time period to act on behalf of the Toy Barn, 7th Gear and ES Exotics as part of their scheme to defraud ELL.  By way of example:

A.  Mr. Cunix, Mr. Cook, Person A, Person B, and Person C messaged each other over text message, WhatsApp, and/or email to discuss procuring exotic vehicles using ELL funds that both knew did not have valid titles.

B.  Mr. Cunix, Mr. Cook and Mr. Sulejmani messaged each other over text message, WhatsApp, and/or email to discuss using ELL funds to purchase a 2022 Corvette.

C.  Mr. Cook used his email to send to Mr. Nale fraudulent financial reports created in Microsoft Excel in an effort to further conceal his fraud.

D.  Person A and Mr. Cook used electronic messaging to represent to Mr. Nale that certain titles were in hand or coming, when either they were not or they were already encumbered by liens from third parties in violation of the ELL Exclusive Fleet Agreement.

150.     Defendants, the Toy Barn, Mr. Cunix, Mr. Cook, 7th Gear, Person A, Person B, Person C, Mr. Richardson, Mr. Cook, Sr., ES Exotics, and Mr. Sulejmani communicated via text message and WhatsApp to avoid detection of their fraudulent scheme.

<div align="center">- 45 -</div>

151.    As a result of Defendants' theft of the funds, ELL suffered damages in an amount greater than $11 Million.

## COUNT SIX
## BREACH OF CONTRACT
### Against Mr. Cook and 7th Gear

152.    Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

153.    The ELL Exclusive Fleet Agreement (including all of its amendments) is a valid contract between Plaintiff, ELL, and Defendants, Mr. Cook and 7th Gear.

154.    Plaintiff, ELL, fully performed its obligations under the contract.

155.    Using monies provided by ELL, among other terms, the contract requires Mr. Cook and 7th Gear to purchase exotic vehicles free and clear of any liens or encumbrances.  The contract also requires Mr. Cook and 7th Gear to grant to ELL a first position lien on all vehicles purchased with ELL funds.

156.    Among other terms, the contract also requires Mr. Cook and 7th Gear to provide revenue sharing and real time data on the ELL Fleet segregated by vehicle.

157.    Mr. Cook and 7th Gear breached the contract by, among other things, failing to purchase vehicles with clear titles, failing to add Plaintiff to the vehicles as first position lien holders, failing to provide documentation, failing to provide revenue sharing, failing to honor the exclusivity provision, failing to return any of the monies due to ELL pursuant to the First Amendment, and failing to provide ELL with access to the ELL Fleet.

158.    As a direct and proximate cause of Mr. Cook and 7th Gear's breaches of the contract, Plaintiff have suffered damages greater than $11 Million.

## COUNT SEVEN
## BREACH OF CONTRACT
### Against Mr. Sulejmani and ES Exotics

159.    Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

160.    Plaintiff, ELL, and Defendants, Mr. Sulejmani and ES Exotics, formed a valid oral contract for the purchase of 2022 Corvette to include in the ELL Fleet.

161.    Plaintiff, ELL, fully performed its obligations under the contract, including paying the purchase price to ES Exotics.

162.    Mr. Sulejmani and ES Exotics breached the contract by, among other things, failing to provide a valid title, failing to add ELL to the vehicle as first position lien holders, and failing to provide documentation on the 2022 Corvette.

163.    As a direct and proximate cause of Mr. Sulejmani and ES Exotics' breaches of the contract, Plaintiff have suffered damages greater than $100,000.

### COUNT EIGHT
### UNJUST ENRICHMENT
### Against all Defendants

164.    Plaintiff repeat and reallege the allegations set forth above as if fully restated herein.

165.    As a result of the acts and/or omissions set forth above, Defendants received benefits from Plaintiff in the form of misappropriated funds totaling more than $11 Million.

166.    As a result of the acts and/or omissions set forth above, Defendants have been unjustly enriched.

167.    The benefits received were procured by fraud, through conspiracy, theft, and in bad faith.

168.    Plaintiff is entitled to recover as damages the value of Defendants' enrichment in the amount of no less than $11 Million.

169.    The acts and/or omissions of each Defendant were deliberate, intentional, knowing, willful, reckless, and/or malicious and demonstrates malice and aggravated or egregious fraud.

**WHEREFORE**, Plaintiff under all counts of the Complaint requests the Entry of Judgment for the following relief:

A. Compensatory damages, jointly and severally from all Defendants, in an amount greater than $75,000;

B. A temporary restraining order and a preliminary and permanent injunction to enjoin Defendants from selling or placing any lien on any of the vehicles in 7th Gears's possession, custody, or control;

C. A temporary restraining order and a preliminary injunction to enjoin Defendants from using, converting, transferring, or disposing of any of their assets, including any vehicles located in Ohio or Florida;

D. A temporary restraining order and a preliminary injunction to order Defendants to provide information about the funds provided by ELL, due to ELL, and/or received or spent by Defendants;

E. Prejudgment attachment of funds and vehicles;

F. Pre-judgment and post-judgment interest;

G. Punitive damages jointly and severally from all Defendants;

H. Attorneys' fees and costs to prosecute this action; and

I. Award such other and further relief as may be just and proper.

Respectfully submitted,


PETERSON CONNERS LLP                           ROBERT HUFF MILLER LLC

  s/ Istvan Gajary                               s/ Robert Huff Miller by s/ Istvan Gajary per email
                                                authority
GREGORY S. PETERSON (0061915) Trial Attorney    ROBERT HUFF MILLER (0076939) Trial Attorney
ISTVAN GAJARY (0089084)                         100 East Broad Street, Suite 230
545 Metro Place South, Suite 435                Columbus, Ohio 43215
Dublin, Ohio 43017                              Telephone: 614.384.5794
Telephone: 614.365.7000                         E-mail: rob@roberthuffmiller.com
Facsimile: 614.220.0197
E-mail: gpeterson@petersonconners.com             *Counsel for Plaintiff*
E-mail: igajary@petersonconners.com

  *Co-Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable under law.

                                    s/ Istvan Gajary
                                  ISTVAN GAJARY


- 48 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was filed electronically on this __th day of February, 2025 with the Clerk of Court using the CM/ECF system. Service will be made through the Court's CM/ECF system on all parties and attorneys so registered, and all parties may access this filing through the Court's system.


 /s/ Istvan Gajary
ISTVAN GAJARY  (0089084)